Jewel Richard McGEE, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 69324.

Court of Criminal Appeals of Texas,
En Banc.

Feb. 15, 1989.
Rehearing Denied May 24, 1989.

Russell J. Wright, Silsbee, Woody Monica, Houston, for appellant.

R.F. "Bo" Horka, Dist. Atty. & Richard B. Dutton, Asst. Dist. Atty., Kountze, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

MILLER, Judge.

Appellant was convicted of capital murder. V.T.C.A. Penal Code, Sec. 19.03. The death penalty was imposed after the jury answered affirmatively the special issues submitted under Art. 37.071, V.A.C.C.P. On June 11, 1986, 711 S.W.2d 257, we held that the trial court erred in failing to order the court reporter to transcribe the notes taken during the voir dire examination of several jurors, and we abated this appeal. We now have the proper record before us and will address appellant's twelve remaining points of error. We will affirm appellant's conviction.

The record reflects that William Pascal Crosby, a 73 year old man, was beaten to death on September 26, 1983, in Kountze, Texas. His body was found the following day hidden in heavy brush behind a home that he operated as rental property. Wilson Roberts, Chief of Police of the Kountze Police Department, testified at trial that the deceased's body apparently had been dragged from the kitchen of the rental home to the brushy area. The alleged mur-

der weapon, a claw-hammer, was also found in this heavily brushed area. Chief Roberts believed that appellant had borrowed this hammer from a Kountze resident, as he had discussed the hammer with the resident's wife but could not recall this person's name.

Chief Roberts further testified that, in his opinion, the deceased had been subdued by a swift and powerful attack in the kitchen of the rental home. He stated that the settled dust on the floor and the undisturbed items in the kitchen indicated that there had not been a struggle prior to the attack on the deceased's head with the hammer. A bucket of bloody water and a mop were found in the middle of the kitchen floor; the panelling in the kitchen was splattered with blood. Chief Roberts testified that it was his opinion that the wounds received during the attack in the kitchen would incapacitate a person.

Sharon Lummus leased a filling station on the corner of Vaughan Street and Highway 69 in Kountze with Crosby. She knew, as did most Kountze residents, that Crosby always carried a large amount of cash in his wallet and conducted his business transactions in cash. Lummus testified that she had known appellant a week to ten days prior to Crosby's murder and that appellant had worked for Crosby for that approximate amount of time. Lummus saw both appellant and Crosby on September 26, 1983. She loaned appellant one dollar that morning so that he could purchase a can of Skoal, and Crosby made his usual evening stop to check on the station. The filling station is located on the same street as Crosby's rental home.

Andrew Sells, a resident of Kountze, testified that he and three friends, Charlie Gaston, Earnestine Warren, and Maurice Wyatt, a relative of appellant, were going to play tennis at the junior high school across the street from Crosby's rental home on September 26, 1983. Sells testified that the four of them entered the parking lot of the school between 6:30 and 6:45 p.m. that night, that they saw appellant behind the rental home at this time, and that Maurice Wyatt called out to appel-

lant, but appellant ignored him, got in Crosby's car and quickly drove away. Sells stated they thought it was unusual that someone other than Crosby was driving his car.

Appellant's girlfriend at the time of his arrest, Carlos Douglas, testified at trial as to appellant's whereabouts on the day of the alleged murder. Appellant picked her up at her home about 7:00 p.m. on September 26, 1983; he was driving Crosby's yellow and black Mustang. Appellant and Douglas went to Wal-Mart, where appellant bought her some rings and gave her $100.00. Appellant also purchased a gym suit, a pair of shoes, a pair of socks, and a gold watch for himself. Douglas testified that appellant turned his back to her each time he removed money from the wallet he was carrying, but that she could see it was an old brown wallet that had "a whole bunch" of money in it. Thirty minutes after returning home, appellant again picked up Douglas at her home for a date; she and appellant went to a local motel. When appellant took Douglas home that evening, he gave her $50.00 for her mother and asked for directions to Woodville.

Ruby Crosby, the wife of the victim, testified that she last saw her husband at his washateria about 4:00 p.m. on September 26, 1983, and phone records indicate she last spoke with him at 5:39 p.m. She verified that her husband carried an old brown wallet and a large amount of cash. Mrs. Crosby also identified Mr. Crosby's handwriting on the envelopes of cash found in the trunk of the Mustang at the time of appellant's arrest. Mrs. Crosby knew of no trouble between appellant and her husband.

James Miller, a highway patrolman with the Texas Department of Public Safety, was assigned to the Woodville area in Tyler County at the time of the alleged offense. Officer Miller testified that he received an all points bulletin from the dispatcher regarding a black and yellow mustang. Officer Miller passed appellant on Highway 190 in the Woodville area on the morning of September 27, 1983. Upon pursuit by Officer Miller, appellant sped up and disap-

peared down a dirt road. Officer Miller found the deceased's car on this dirt road with the motor running and the driver's door open. Officer Miller testified that appellant ran into the adjacent wooded area.

Rudy Trahan, the Criminal Investigator with the Hardin County District Attorney's Office, assisted Chief Roberts with the investigation in Woodville, Texas. Trahan found the deceased's car abandoned on a dirt road off Highway 190. He found in the car a can of Skoal, hand lotion, and an afro-comb. In the trunk of the car, he recovered a Wal-Mart sack, a pair of tennis shoes and a pair of jeans, both splattered with blood, and envelopes containing $250.00 cash from the U-Wash N Dry, one of Crosby's businesses in Kountze. At the time of his arrest, appellant had $712.00 in cash in the pocket of the sweat pants he was wearing.

Steven Lee, an employee with the Texas Alcoholic Beverage Commission, responded to the bulletin of the capital murder of Crosby. Officer Miller informed him that appellant had abandoned the car and was running through the woods. Lee patrolled the area of Highway 190 and discovered appellant running along the highway. Lee testified that as he pulled to the shoulder of the road, appellant quit running and put his hands up. Appellant was sweaty, dirty, and had debris in his hair. Appellant was arrested in the parking lot of the Hope Well Church and taken to the Tyler County Courthouse by Sheriff Leon Fowler. A billfold was found in one of appellant's socks. Lee testified that appellant identified himself as Robert Jackson at the time of his arrest.

Dr. Howard Wilcox, the pathologist who performed the autopsy of Crosby, testified that the deceased had wounds to his left hand, mouth, face, top of his head, and the temporal area of his head. The blows to the temporal area fractured the deceased's skull and severely tore his ear. In Dr. Wilcox's opinion, these wounds were severe enough to cause death and were consistent with being made by a hammer. Dr. Wilcox also testified that the blows to the top of the deceased's head had been made by

striking the deceased with extreme force with a flat object; these wounds shattered the deceased's skull. The autopsy report reflected that two weapons were used in the attack.

The Laboratory Technician with the Jefferson County Regional Crime Lab, Phyllis Bowers, testified that she was an expert in serology and had performed the blood typing tests on the items from the murder scene and the vials of Crosby's blood. Bowers found human blood on both the hammer and the tennis shoes but could not type any of it. The blood on the pair of jeans and on the kitchen wall was Group A human blood. Bowers testified that the victim, Crosby, had Group A blood type, but there was no evidence offered as to appellant's blood type.

■ Appellant makes two challenges to the sufficiency of the evidence. In his third point of error, appellant contends that the evidence was insufficient to sustain the descriptive averments in the indictment. The indictment alleged in pertinent part that appellant:

> while in the course of committing and attempting to commit ROBBERy (sic) upon and of WILLIAM PASCAL CROSBY intentionally cause the death of WILLIAM PASCAL CROSBY, hereafter styled the Complainant, by hitting the victim over the head with a hammer.

Appellant argues that the State relied on proof that the murder weapon was a brick and that if cause of death was by a brick, it would have been at a time after appellant hit the deceased with the hammer and after appellant formed the intent to take the deceased's property. The gist of this argument is that if the alleged murder was committed with a brick, it was not done in the course of a robbery, and therefore the capital murder conviction fails for insufficiency. Appellant also makes this argument in his fifth point of error. We will first address whether there is a variance between the proof at trial and the allegations in the indictment.

At trial the State introduced into evidence a brick taken from the area behind Crosby's rental home. The brick, however,

was admitted into evidence only for a limited purpose. The State tendered the brick only as an object available at the murder scene for appellant to use and as one similar to the blunt object that Dr. Wilcox testified may have been used to inflict wounds upon the top of Crosby's head. The brick was not introduced into evidence as the alleged murder weapon at any point during the trial.

The State introduced the claw-hammer into evidence at trial. Chief Roberts testified that this hammer was found underneath heavy brush at the rear of the rental home in basically the same area where Crosby's body was discovered. He also testified there was evidence that the hammer had been used in an attack because there were blood stains on the hammer. Moreover, Dr. Wilcox testified that he compared the hammer with the wounds to Crosby's head and that the wounds were consistent with being made by this instrument. As noted earlier, Dr. Wilcox determined these wounds to be severe enough to cause the death of Crosby.

During argument at the guilt/innocence stage of the trial, the prosecutor stated that he believed the death occurred when Crosby was hit with a brick. Although there was no objection to this statement by defense counsel, the trial judge promptly instructed the jury to disregard the prosecutor's comment as there was "no evidence of any hitting with a brick." The charge to the jury authorized conviction only upon a finding that appellant used a hammer to murder the victim, and the jury found appellant guilty as charged in the indictment. We find the evidence was sufficient to sustain the allegation that a hammer was the murder weapon. Appellant's point of error is overruled.

■ Appellant contends in his fifth point of error that the evidence was insufficient to establish that the murder was committed in the course of committing robbery and that the trial court erred in overruling his motion for instructed verdict based upon this contention. Appellant argues further that murder and a subsequent theft do not constitute capital murder. We find that the evidence is sufficient to prove capital murder and hold that the trial court did not err in overruling appellant's motion for instructed verdict.

This Court has defined "in the course of committing" an offense listed in Sec. 19.-03(a)(2), supra, as conduct occurring in an attempt to commit, during the commission, or in the immediate flight after the attempt or commission of the offense. *Riles v. State*, 595 S.W.2d 858 (Tex.Cr.App.1980). We have held numerous times that this aggravating element is sufficiently proven if the State proves the robbery occurred immediately after the commission of the murder. See *Huffman v. State*, 746 S.W.2d 212 (Tex.Cr.App.1988); *Lincecum v. State*, 736 S.W.2d 673 (Tex.Cr.App.1987); *Demouchette v. State*, 731 S.W.2d 75 (Tex. Cr.App.1986); *Fierro v. State*, 706 S.W.2d 310, 313 (Tex.Cr.App.1986); and *Riles*, supra.

There is ample evidence that appellant committed a robbery either during or immediately after the commission of the murder. See *Lincecum*, supra. Crosby was found dead, brutally beaten, and his wallet and car were missing. Andrew Sells testified that he and his friends saw appellant leaving Crosby's rental home in Crosby's car shortly after the time of the alleged murder. Appellant, who earlier that day borrowed a dollar for a can of Skoal, purchased clothing and jewelry for himself and his girlfriend later that evening. He was apprehended shortly after the murder and was in possession of Crosby's car and cash, as stated earlier in the facts. Appellant argues that the evidence that he borrowed a dollar to buy a can of Skoal is the only evidence introduced at trial to show his intent to commit robbery, but we do not agree with appellant. While there is no evidence that appellant demanded money or property from Crosby before attacking him with the hammer, such evidence is not the talisman of an intent to steal; the intent may be inferred from the actions or conduct of appellant. See *Fierro*, supra, citing *Banks v. State*, 471 S.W.2d 811 (Tex. Cr.App.1971).

Appellant complains that the evidence establishing that the murder was committed "in the course of committing robbery", the aggravating element of this offense, is circumstantial. The test for determining the sufficiency of the evidence, either direct or circumstantial, is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Huffman,* supra, citing *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and *Houston v. State,* 663 S.W.2d 455 (Tex.Cr.App.1984) (Opinion on rehearing). We conclude that an intent to steal may be inferred from the facts and that a rational trier of fact could have found beyond a reasonable doubt that appellant committed the essential elements of capital murder. Therefore, the evidence is sufficient to show appellant committed this murder in the course of committing a robbery. See *Huffman,* supra. This point of error is overruled.

■ In his fourth point of error, appellant contends the indictment was fundamentally defective because it failed to inform him of the manner and means of death. Appellant filed a motion to quash the indictment alleging that the failure of the indictment to plead the matters set forth in Art. 37.071, V.A.C.C.P., violated the constitutions of Texas and the United States, but appellant did not challenge the indictment on the notice grounds that he now alleges. Appellant may not now complain of a lack of notice of the manner and means of commission of this offense. See *American Plant Food Corporation v. State,* 508 S.W.2d 598 (Tex.Cr.App.1974); *Granviel v. State,* 552 S.W.2d 107 (Tex.Cr. App.1976) cert. denied 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977); *Livingston v. State,* 739 S.W.2d 311 (Tex.Cr.App. 1987).

Appellant also complains of a lack of notice that the State intended to prove the murder weapon was a brick, and as a result, he was prevented from presenting a proper defense. This complaint is without merit. The indictment alleged only the hammer as the alleged murder weapon. The allegation that appellant caused the death of Crosby "by hitting the victim over the head with a hammer" provides appellant with notice of the charge against him. The jury found appellant guilty of capital murder as alleged in the indictment. Moreover, the record shows that the State introduced the hammer into evidence as the murder weapon, not the brick. As mentioned earlier, there was evidence of a brick at the the murder scene, but the medical examiner, Dr. Wilcox, testified that Crosby's fatal wounds were consistent with being inflicted with a hammer. We therefore find no unfair surprise to appellant and overrule appellant's point of error.

Appellant's first two points of error concern the excusal of prospective juror Henrietta Isles Locke. Appellant initially argues that Locke was improperly excused for cause under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Appellant complains that this prospective juror did not make it unmistakably clear that she would automatically vote against the death penalty without regard for the evidence adduced at trial or that her attitude toward the death penalty would prevent her from making an impartial decision as to appellant's guilt.

■ In *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court clarified its holding in *Witherspoon,* supra, and reaffirmed the standard, enunciated in *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), for determining whether a challenge for cause by the State has been improperly granted. The proper standard to be applied in disqualifying jurors in death penalty cases is whether a prospective juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath. *Witt,* supra; and *Sharp v. State,* 707 S.W.2d 611 (Tex.Cr. App.1986). Contrary to appellant's contention, there is no requirement that a prospective juror's bias be proved with unmistakable clarity. *Witt,* supra, 469 U.S. at 424, 105 S.Ct. at 852.

■ The voir dire examination of Locke revealed that she had known appellant and his family for seven or eight years and that "[appellant] is like a son" to her. The District Attorney then questioned Locke as to her feelings regarding that relationship and also the death penalty:

Q. Let me ask you this question: Do you understand this is a Capital Murder case and that the State is seeking the Death Penalty in this case?

A. Yes, sir.

Q. All right. Let me ask you this: With your knowledge of the Defendant, do you feel like there is any possible way you could give him the death penalty, that you could even consider it?

A. No.

Q. No matter what the evidence showed, no matter what it showed, could you or couldn't you?

The defense attorney immediately interjected a request to the court that the district attorney use *Witherspoon* criteria. The prosecutor then asked:

Q. (by the District Attorney) Let me ask you this: Could you consider the death penalty in any case?

A. You asking me do I believe in the death penalty?

Q. Right.

A. No, sir.

Q. Could you consider it in any case? I mean no matter how horrible the crime could you give somebody—do you feel like you could vote to give them the death penalty?

A. No, sir.

Q. There is no way?

A. No, sir.

Q. Now here is what I've got to ask you. You know this is something where you have got to do it out of your heart and this is coming from here (indicating).

A. Mu-huh.

Q. Do you feel like the—I know that some people are against it. They feel like God is the only one that ought to do that and they feel like that through the Bible they are not supposed to do it and through their own convictions.

You know we have to stand on our convictions and this is what I am asking you. Do you have a conviction against the death penalty such that you couldn't consider it; that you are not going to give the death penalty no matter what the circumstances were? Even if they killed one of your own children, you would still say, it is not my place to have this person executed, even though you hate the person and even though you would want to do it, you couldn't vote to do it because it is against your principles?

A. No, sir.

BY THE COURT: What was that?

PROSPECTIVE JUROR: I couldn't give no one the death penalty.

Upon further examination by both the District Attorney and the trial judge, Locke stated that under no circumstances could she ever vote for the death penalty regardless of the evidence. This testimony supports the trial judge's implied finding that Locke's views toward the death penalty would substantially impair or prevent the performance of her duties as a juror. Therefore, the trial judge properly excluded her for cause. Appellant's point of error is overruled.

■ Appellant also argues that "the trial court erred in refusing to allow defense counsel to question [Locke] on voir dire prior to granting the prosecuting attorney's challenge for cause in death penalty case when it could not be said with certainty that [Locke] held such a firm and fixed attitude and position that she would have been prevented from making an impartial decision as to [appellant's] guilt or from deciding the submitted statutory special issues fairly." We first note that appellant misstates the record in this point of error. Appellant was allowed to question Locke on voir dire prior to her excusal by the trial judge. We also conclude that under the circumstances of this case Locke would be prevented from making an impartial decision as to appellant's punishment.

As noted earlier, Locke's testimony established that she was close to appellant and his family. Upon examination by the

District Attorney, Locke stated that she did not want to sit on appellant's jury because of her close relationship with him and that her feelings for appellant would influence her in finding a verdict in this case. Locke answered affirmatively that she could not be fair and impartial in this case and that she had a preconceived idea about the guilt of appellant which would influence her in finding a verdict in this case. The District Attorney challenged Locke for cause under Art. 35.16(a)(10)[1], V.A.C.C.P., but the trial judge did not make a ruling at that time.

Appellant was then given the opportunity to question Locke. Under questioning by defense counsel, Locke answered affirmatively the question whether she "could fairly and impartially hear the evidence" and make a decision as to appellant's guilt based on the evidence at trial. Locke stated that in that respect she did not have a bias in favor of or against appellant. At this point the trial judge directed the prosecutor to continue the voir dire of Locke without ruling on the challenge for cause.

The prosecutor's voir dire elicited testimony from Locke regarding her attitude toward the death penalty, as previously set out in this opinion. The trial judge granted the District Attorney's challenge for cause after the elicitation of this testimony and stated that he took all matters pertaining to that juror into consideration when granting the challenge. Since Locke was disqualified under *Adams*, supra,[2] at the time the trial judge sustained the State's challenge for cause, the error in disallowing defense counsel the opportunity to *further* question the prospective juror was harm-

less. See *Perillo v. State*, 656 S.W.2d 78 (Tex.Cr.App.1983).

In *Perillo*, supra, we held that refusal by the trial judge to permit defense counsel to question a prospective juror in a death penalty case is error, but such error may be harmless depending upon whether "the record affirmatively and unequivocally reflects that the prospective juror would, regardless of the evidence, automatically vote for a verdict that would prohibit the assessment of the death penalty." *Perillo*, supra at 81. Our review of the voir dire indicates that the trial judge and the prosecutor each questioned Locke. Her testimony established that because of her beliefs regarding the death penalty that she could never vote for the death penalty.

■ Failure to grant defense counsel the opportunity to question a prospective juror is not reversible error where the record shows that the venireperson was questioned at length and that she could not vote for the death penalty under any circumstances. See *White v. State*, 629 S.W.2d 701 (Tex.Cr.App.1982) and cases cited therein; and *Vanderbilt v. State*, 629 S.W.2d 709 (Tex.Cr.App.1981). Having found no reversible error in the trial court's limitation of voir dire by appellant's counsel, we overrule this point of error.

In his sixth point of error, appellant contends the trial court erred in prohibiting his attorney from arguing to the jury, as set out in appellant's bill of exception, that:

"There is very little reliability in a circumstantial evidence case. The higher courts have required this higher burden of the State in this kind of a case because

1. Article 35.16(a)(10), supra, provides in pertinent part that:
 (a) A challenge for cause is an objection made to a particular juror, alleging some fact which renders him incapable or unfit to serve on the jury. A challenge for cause may be made by either the state or the defense for any one of the following reasons:
 10. That from hearsay, or otherwise, there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as would influence him in his action in finding a verdict. To ascertain whether this cause of challenge exists, the juror

shall first be asked whether, in his opinion, the conclusion so established will influence his verdict. If he answers in the affirmative, he shall be discharged without further interrogation by either party or the court.... If the court, in its discretion, is not satisfied that he is impartial, the juror shall be discharged.

2. From the testimony of Locke, it appears that she may also have been disqualified under Art. 35.16(a)(10), supra, but we do not need to resolve that issue in addressing appellant's contention in this point of error.

of the fact that there is a less reliability in a circumstantial evidence case.... There is ... a Texas case that says that they must prove to you that in a circumstantial evidence case there is guilt to a moral certainty.... We also are saying that they must prove to you to a moral certainty that their case is true and correct, if they want to put this man to death."

We have held that improper denial of a jury argument may constitute a denial of the right to counsel, *Johnson v. State*, 698 S.W.2d 154 (Tex.Cr.App.1985) citing *Riles*, supra, and *Spangler v. State*, 42 Tex.Cr.R. 233, 61 S.W. 314 (1900), but this holding assumes, *inter alia*, that the jury argument is one the defendant is entitled to make. The State is not required to prove appellant's guilt to a moral certainty. *Carlsen v. State*, 654 S.W.2d 444 (Tex.Cr. App.1983); *Beardsley v. State*, 738 S.W.2d 681 (Tex.Cr.App.1987); *Alexander v. State*, 740 S.W.2d 749 (Tex.Cr.App.1987). Moreover, proof of circumstantial evidence is not subject to a more rigorous standard than is proof by direct testimonial evidence. *Hankins v. State*, 646 S.W.2d 191 (Tex.Cr. App.1983) (Opinion on State's motion for rehearing). As we stated in *Hankins*, supra at 199, "there is but one standard of proof for criminal convictions ... this Court is recognizing that for purposes of proving guilt beyond a reasonable doubt, direct and circumstantial evidence are equally probative." Thus, the argument of appellant's counsel was an incorrect statement of the law and not an argument he was entitled to make. We hold the trial court's rejection of the argument was not error and overrule appellant's sixth point of error.

In appellant's seventh, eighth and ninth points of error, he claims the trial court erred in overruling his objections and motions for mistrial based upon prosecutorial misconduct in the jury arguments at both the guilt/innocence and punishment phases of trial. We will address each point in the order presented.

Appellant argues in his seventh point of error that the District Attorney made comments designed to strike at and demean appellant's counsel in his arguments at both the guilt/innocence and punishment stages of trial. It is axiomatic that the State may not strike at the defendant over the shoulders of his counsel or accuse the defense counsel of bad faith and insincerity. *Fuentes v. State*, 664 S.W.2d 333 (Tex. Cr.App.1984), citing *Bell v. State*, 614 S.W.2d 122 (Tex.Cr.App.1981). Appellant complains of eleven statements in the District Attorney's jury arguments. Appellant, however, failed to object to five of these statements during trial, so no error is preserved for our review. See *Cook*, supra; *Sanchez v. State*, 589 S.W.2d 422 (Tex.Cr.App.1979). We will examine the six remaining instances when appellant made an objection.

In five of the instances in which appellant objected, the trial judge sustained the objection and instructed the jury to disregard the District Attorney's remarks. The general rule is that an instruction to disregard a comment in jury argument will cure the error. See *Anderson v. State*, 633 S.W.2d 851, 855 (Tex.Cr.App.1982), and *Miller v. State*, 741 S.W.2d 382 (Tex.Cr. App.1987). Reversible error occurs only when statements to the jury are so extreme, manifestly improper, or inject new and harmful facts into the case that they deprive the defendant of a fair and impartial trial. *Miller*, supra; *Logan v. State*, 698 S.W.2d 680 (Tex.Cr.App.1985).

Appellant contends that even though his objections to the following statements of the prosecutor during argument at the guilt/innocence stage were sustained, the statements still amount to reversible error because the arguments imply that defense counsel's ethical standards are lower than those of the prosecutor. The prosecutor made the following arguments:

"So, what are they [defense counsel] asking you to do? They are asking you to bring something from outside and bring it in here and say, suppose it happened like this? It didn't. There was no prob-

lem between them [appellant and victim]."

\* \* \* \* \* \*

"All of those people [witnesses: Miss Hollis, Mrs. Crosby, Chief Roberts] are totally lying. That is what they are asking you to disregard—all the good evidence, all the good people who have come up here to testify—"

\* \* \* \* \* \*

"Sure it could have been an accidental happening. He just could have been wandering through the neighborhood, too. I don't think you are going to buy that, and that is what they are asking you to do."

\* \* \* \* \* \*

"Now we are playing games with words. That is all we have done since we started here."

The prosecutor then argued at punishment: "What I am telling you is that from their argument, their presentation of their whole case has been either for sympathy or to distort the truth."

In determining whether these comments by the prosecutor constitute reversible error, we must view the alleged argument error in light of the facts adduced at trial and in the context of the entire argument. *Logan, supra,* at 682; *Mosley v. State,* 686 S.W.2d 180 (Tex.Cr.App.1985). The prosecutor's comments were in response to the argument of appellant's theory of the commission of the alleged murder. In presenting their defense, appellant's counsel contended that there had been an argument between appellant and Crosby prior to the murder and that appellant did not intend to murder Crosby and rob him. Appellant's counsel argued to the jury at guilt/innocence that this case involved a murder and a theft, not a murder in the course of robbery, and therefore was not a capital murder. The prosecutor's argument points out that there was no evidence adduced at trial to directly support the contentions of

appellant's counsel. Upon objection to the prosecutor's comments, the trial judge instructed the jury to draw their own inferences from the evidence and disregard the comments. We hold that when these comments are viewed in context of the evidence and the argument of counsel as a whole no reversible error is committed.[3]

■ The record shows only one point at trial where appellant's counsel objected to the prosecutor's jury argument and was overruled. The prosecutor stated the following in his argument at punishment:

"I asked every one of you about the death penalty. It is our law. You know it is not something that you now can decide that you don't want to follow. I resent that they would ask you to violate your oath. They say use your sympathy, nobody says that you can't use your heart."

From our review of the record, we find that the prosecutor's comments were in answer to the jury argument of appellant's counsel that justice is not heartless and does not require the jurors to put aside their feelings when determining punishment for appellant. Therefore, no error was committed by the trial court in allowing this argument. We cannot say that this argument was manifestly improper, harmful, and prejudicial in light of the record as a whole. Cf. *Simpkins v. State,* 590 S.W.2d 129 (Tex.Cr.App.1979). Appellant's seventh point of error is overruled.

■ Appellant's eighth point of error presents a claim that the prosecutor improperly commented on appellant's failure to testify in his jury argument at the guilt/innocence phase of trial. Appellant presents a multifarious claim complaining of six statements made by the prosecutor during his argument. Since this point of error is multifarious and does not comply with Art. 40.09, V.A.C.C.P., nothing is presented for review. *Thiel v. State,* 676 S.W.2d 593 (Tex.Cr.App.1984); *Mitchell v. State,* 650 S.W.2d 801 (Tex.Cr.App.1983),

---

**3.** We note that this case is not one where the prosecutor accuses defense counsel of manufacturing evidence, lying to the jury, or suppressing evidence. We have held that such comments

constitute reversible error. *Bell v. State,* 614 S.W.2d 122 (Tex.Cr.App.1981). See also *Carrillo v. State,* 591 S.W.2d 876 (Tex.Cr.App.1979) and cases cited therein.

and cases cited therein. Moreover, our review of the record reveals that appellant failed to object at trial to five of these statements. Unless the arguments of the prosecutor are so prejudicial that no instruction could cure the harm, the failure to timely object waives any error. *Losada v. State*, 721 S.W.2d 305, 313 (Tex.Cr.App. 1986); *Green v. State*, 682 S.W.2d 271 (Tex.Cr.App.1984). In the one instance where appellant's counsel did object and preserve error for review, he objected on the ground that prosecutor's statement was not supported by the evidence at trial, not on the ground that his argument was an improper comment on appellant's failure to testify. An error presented on appeal must be the same as the objection raised at trial or be waived. *Vanderbilt v. State*, 629 S.W.2d 709 (Tex.Cr.App.1981), cert. denied 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 169 (1982), and cases cited therein. Appellant's eighth point of error is overruled.

▰▰▰ In his ninth point of error, appellant argues that the prosecutor made an improper plea for law enforcement in his jury arguments at both the guilt/innocence and punishment phases of trial. We first note that there was no objection to the arguments which appellant now contends were improper; therefore, no error is preserved. We have reviewed, however, the prosecutor's arguments and have determined that, in effect, the prosecutor asked the jury to send a message to the community that it will not tolerate violence within its own community. The prosecutor's statements were not an appeal based on unproven sentiments of the community which this Court has held to be reversible error.[4] Appellant's point of error is overruled.

▰▰▰ Appellant next argues that the trial court erred in refusing his specially requested jury charge on the definition of "deliberately" as employed by the first special issue submitted to the jury at punishment pursuant to Art. 37.071(b)(1), V.A.C. C.P.[5] The record reflects that appellant requested three different definitions of deliberately, and each was refused by the trial judge. The jury charge on punishment did not include a definition of deliberately. We have repeatedly held that the trial judge need not define the word "deliberately" in its charge to the jury on punishment. *Demouchette v. State*, 731 S.W.2d 75 (Tex.Cr.App.1986), citing *Cannon v. State*, 691 S.W.2d 664 (Tex.Cr.App.1985); *Russell v. State*, 665 S.W.2d 771 (Tex.Cr. App.1983). Appellant's tenth point of error is overruled.

▰▰▰ In appellant's eleventh point of error, he claims the trial court erred in admitting into evidence a photograph taken immediately *prior* to the autopsy of Crosby. The photograph is of the hammer held next to Crosby's head. Appellant claims that admission of this photograph was error because it suggests the position of the parties at the time of the infliction of the fatal wound, a matter in dispute. Appellant asserts that once the jurors viewed this photograph there no longer remained an issue as to the relative position of the parties because the alleged murderer would have been holding the hammer as Dr. Wilcox was in the photograph.

We find that appellant's assertion is without merit and hold the photograph was properly admitted into evidence. Dr. Wilcox testified that he placed the hammer next to Crosby's head so that "...I could approximate the broken portion and the other portion [of the hammer] to one of these wounds to show the relationship of this instrument and the wound that was

---

4. In *Pennington v. State*, 345 S.W.2d 527 (Tex. Cr.App.1961), we reversed on the prosecutor's argument that "The people of Nueces County expect you to put this man away." Likewise, in *Cox v. State*, 247 S.W.2d 262 (Tex.Cr.App.1952), the State's argument was "The people of DeSoto are asking the jury to convict this man."

5. Article 37.071(b)(1), supra, provides:

(b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result.

produced by the instrument." Chief Roberts testified using the photograph to show that the hammer was consistent with the type of wounds inflicted on Crosby's head. The State sought to prove through the use of the photograph and the testimony of these two witnesses that the hammer found at the scene of the murder was in fact the murder weapon, as the hammer was capable of inflicting the wounds that were on the body of the deceased. The State did not seek to prove the position of the parties during the alleged murder as appellant contends. We hold that this photograph was competent, material and relevant to determining whether Crosby was killed by being beaten with a hammer, as alleged in the indictment. The trial judge therefore did not abuse his discretion in admitting the photograph into evidence. See *Harrington v. State*, 547 S.W.2d 621 (Tex.Cr.App.1977); *Phillips v. State*, 511 S.W.2d 22 (Tex.Cr.App.1974). We therefore overrule appellant's eleventh point of error.

In his final point of error, appellant contends the trial court erred when it denied his motion for change of venue. Appellant filed his motion on December 12, 1983, and a hearing was held on the motion on January 20, 1984, approximately four months after the offense was committed. Appellant attached the affidavits of two persons whose beliefs were that appellant could not receive a fair trial in Hardin County. Appellant also attached copies of three newspaper articles concerning Crosby's death and appellant's arrest.

The State did not file any affidavits contesting the facts raised in appellant's affidavits and motion for change of venue. If no controverting affidavit is filed by the State, a defendant is entitled to a change of venue as a matter of law. *McManus v. State*, 591 S.W.2d 505 (Tex.Cr. App.1979). Appellant in this cause *waived* his per se right to a change of venue, however, by proceeding to the hearing on the motion without objecting that there was no issue of fact to be tried because the State had failed to controvert the affidavits supporting his motion. *McManus*, supra,

and cases cited therein. The State did, however, present controverting testimony at the hearing on appellant's motion.

At the hearing on the motion for change of venue, appellant presented the testimony of eleven witnesses. Seven of these witnesses were either reporters or editors of the print and electronic media in Hardin County and nearby Jefferson County. Each of these persons covered the story of Crosby's murder and appellant's subsequent arrest. Their testimony established that the coverage of this story was average, informative and consistent with appellant receiving a fair trial. None of these persons, however, could give an opinion as to the present climate of the community because Crosby's murder had not been a topic of conversation in the community since its occurrence. The testimony of Mike Holzapfel, the Sheriff of Hardin County, collaborated the testimony of the media witnesses. Sheriff Holzapfel stated, when testifying for the State, that public awareness of this case was minimal and that appellant could easily get a fair trial.

Appellant also presented evidence at the hearing that he could not get a fair trial in Hardin County. Delores Veal, appellant's foster mother, testified that people told her that appellant could not get a fair trial because the town (Kountze) was prejudiced. Veal also stated her concern that there were not enough blacks on the jury panel, but testimony at voir dire revealed that the blacks that were on the panel were either struck for cause or did not wish to serve on *this* jury. Two other witnesses testified that appellant could not get a fair trial. Ida Mae Perry, a cafe owner in Kountze, believed that appellant could not receive a fair trial because of "the people they pick for a jury" and because a black man killed a white man. Perry also stated, however, that people told her that Crosby "got what he deserved;" she then testified that she did not know if appellant was going to get a fair trial. Hattie Burrows also testified for appellant at the hearing. People in her beauty shop told her that appellant had killed Crosby but that appellant would not get a fair trial because Crosby was too well-known and loved in

Kountze. Burrows did not believe that there was any conspiracy against appellant by the trial judge or the prosecutor, but she, like Perry, believed the jury was the problem.

The State also presented evidence at the hearing on the motion for change of venue. Mike Holzapfel, Sheriff of Hardin County, testified for the State at the hearing that this case was not a topic of conversation within the community except for two or three days after the discovery of Crosby's body. Sheriff Holzapfel also stated that he believed it would be very easy for appellant to get a fair trial in Hardin County because of the lack of publicity in this case.

When determining whether to grant a motion for a change of venue, the trial judge uses the test of whether outside influences affecting the community's climate of opinion as to the defendant are inherently suspect. *Phillips v. State*, 701 S.W.2d 875 (Tex.Cr.App.1985), and cases cited therein. The trial court does not abuse its discretion in denying a motion for change of venue if the defendant fails to establish such prejudice in the community that the likelihood of obtaining a fair and impartial jury is doubtful. *Id.* See also *Nethery v. State*, 692 S.W.2d 686 (Tex.Cr.App.1985), and *Ussery v. State*, 651 S.W.2d 767 (Tex.Cr.App.1983).

We have reviewed the exhibits of the media coverage of this murder which were introduced into evidence at the hearing. We find that the publicity about this case was not pervasive, prejudicial or inflammatory and that the news reports were apparently published for the purpose of informing the public of current events. See *McManus*, supra. As stated in *Phillips*, supra, simply because a case is publicized in the news media does not by itself establish prejudice or require a change of venue.

Given that the trial court was presented with conflicting testimony and was the sole trier of fact at the hearing, appellant has failed to demonstrate that the trial court abused its discretion in failing to grant appellant a change of venue. Appellant's twelfth point of error is therefore overruled.

Accordingly, the judgment of the trial court is affirmed.

W.C. DAVIS and DUNCAN, JJ., concur in result.

CLINTON, Judge, dissenting.

The majority, *sans* authority, effectively finds support for the trial court's conclusion that venireman Locke was "substantially impaired" in her ability to perform as a juror in this capital case solely because she indicated she "couldn't give no one the death penalty[,]" and could not ever "vote for" that result irrespective of the evidence. Indeed, the majority finds Locke to have shown such an irrevocable disability in the answers she gave, almost all of which are excerpted in its opinion, as to prove herself impervious to rehabilitation. Perceiving two flaws in the majority's analysis, I dissent.

To begin with, in my view there *is* no reasonable basis on this record to support the trial court's implied finding. That a venireman cannot "give" or "vote for" the death penalty is not remotely dispositive in a capital sentencing scheme that does not call for jurors to do so under any circumstances. *Hernandez v. State*, 757 S.W.2d 744 (Tex.Cr.App.1988) (Plurality Opinion). See also, *Ex parte Russell*, 720 S.W.2d 477 (Tex.Cr.App.1986) (Clinton, J., dissenting); *Granviel v. State*, 723 S.W.2d 141, 157 (Tex.Cr.App.1986) (Clinton, J., dissenting); *Hernandez v. State*, 643 S.W.2d 397 (Tex.Cr.App.1982) (Clinton, J., dissenting). Critical to a reasonable evaluation of substantial impairment is the question whether the venireman's reservations, if any, about imposition of the death penalty would or could cause him consciously to distort answers to special issues under Art. 37.071, V.A.C.C.P.; whether, in order to avert that end, the venireman would be inclined to answer at least one special issue negatively in spite of evidence that would convince him beyond a reasonable doubt that both should be answered yes. See *Ex parte Williams*, 748 S.W.2d 461, 463, n. 2 (Tex.Cr.App.1988). Only where the testimony of the venireman may be read to prepon-

derate in favor of a finding that he would be so inclined may we say on appellate review that there is support in the record for the trial court's conclusion the venireman was substantially impaired. Confronted with the proper question, however, the venireman who either "vacillates" or "equivocates," see *Williams v. State,* 622 S.W.2d 116, 121 (Tex.Cr.App.1981) (Teague, J., dissenting), may reasonably be said to be disabled, and under such circumstances we should defer to the trial court's ruling *either* that the venireman is impaired *or that he is not.*

Here, as proponent of the challenge for cause against venireman Locke, the State had the burden to show not just a moral or philosophical aversion to the death penalty, but that such aversion could actually cause the venireman consciously to distort her answers to special issues in order to avoid it. Simply asking the venireman whether she would ever "vote for" the death penalty does not suffice.

Secondly, at the very least in the instant case appellant's counsel should have been allowed to ascertain what we should be requiring the State to ask, *viz:* whether Locke's inclination to "vote" against the death penalty would likely preclude her from answering special issues without conscious distortion or bias.

·In the past, and especially since the decision of the Supreme Court in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), this Court has paid lip service to the trial court's discretion in ruling upon State's challenges for cause. A typical statement appears in *Ex parte Russell,* 720 S.W.2d 477, at 485 (Tex.Cr. App.1986):

> "In making the determination of the qualification of a juror, great deference is to be given to the decision of the trial judge, who has broad discretion in his rulings in challenges, who was present, heard the tenor of the voice of the prospective juror, his demeanor, etc."

See also, e.g., *Smith v. State,* 676 S.W.2d 379, at 387 (Tex.Cr.App.1984); *Smith v. State,* 683 S.W.2d 393, at 401, n. 5 (Tex.Cr. App.1984); *Vanderbilt v. State,* 629

S.W.2d 709 (Tex.Cr.App.1981). Having granted this discretion to trial courts, however, it seems to me we turn around and effectively revoke it when we continually conclude our discussions on these points of error with holdings that "we find" the venireman to have been substantially impaired, or that "clearly" he was so. At least in the context of what has been termed "equivocating" or "vacillating" veniremen, see *Williams v. State,* 622 S.W.2d 116, 121 (Tex.Cr.App.1981) (Teague, J., dissenting), it seems to me that due deference to the trial court means that he has discretion to find such a venireman is *not* in fact impaired, in spite of some obvious difficulty he may have. Categorically to hold, or at least to imply as our holdings do, that such a venireman is in every case substantially impaired sends a message to trial courts that in fact they do *not* have the discretion to overrule State's challenges for cause in the premises. Rather, as a matter of appellate review, this Court should simply hold there is a reasonable basis in the record to support a finding by the trial court that the venireman will be impaired in his ability to abide by his oath as a juror. *Hernandez v. State,* supra. Such a standard of appellate review does not preclude the trial court from exercising its discretion to find that, what from a cold appellate record may appear to be a truly equivocating or vacillating venireman, has actually proven himself, by demeanor, tone or howsoever, able in fact to follow the law. See *Perillo v. State,* 758 S.W.2d 567, at 577 (Tex.Cr.App.1988).

Having vested the trial court with this discretion to arbitrate challengeability of veniremen who appear, at least on a cold record, "to be genuinely noncommittal, vacillating, equivocal, or uncertain," *Hernandez v. State,* supra, 757 S.W.2d at 753, we should never allow it to exercise that discretion unilaterally; that is, without affording the opponent of the challenge the opportunity to rehabilitate the venireman. The majority fails to require the State, as proponent of the challenge for cause, to inquire of Locke specifically whether her opposition to the death penalty could cause her to distort her answers to the special

issues. In the majority's view, it is enough that Locke indicated she would never "vote for" the death penalty. Assuming, *arguendo*, that were true, it seems to me unconscionable not to allow appellant's counsel an opportunity, at the very least, to demonstrate that in answering the special issues in accordance with the evidence Locke would *not*, in her own view, be "voting for" or otherwise personally exacting that harsh result. By refusing to allow counsel this opportunity, the trial court effectively insulated itself from having to exercise that discretion we are so quick to afford. If we are not prepared to hold the State to its burden as proponent of the challenge for cause, at least we should refuse thus to condone the trial court's abdication of its proper function in a capital voir dire.

Absent some other valid, asserted reason for excluding this venireman, I would reverse this conviction under authority of our holdings in *Lackey v. State*, 638 S.W.2d 439 (Tex.Cr.App.1982) (Opinion on appellant's motion for rehearing), and *Rougeau v. State*, 651 S.W.2d 739 (Tex.Cr.App.1982). Because the majority does not, I dissent.

TEAGUE, J., joins this opinion.

## OPINION ON APPELLANT'S MOTION FOR REHEARING

MILLER, Judge.

Appellant was convicted of capital murder. On original submission we affirmed appellant's conviction. We granted appellant's motion for rehearing only to address two points of error raised by appellant in a supplemental brief which were not addressed on original submission. We overrule these points of error and again affirm appellant's conviction.

In his fourteenth point of error, appellant argues that the petit jury was selected and seated in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Appellant contends all blacks on the venire were struck for cause by the State (apparently there were only four blacks on the panel as appellant only mentions four in his brief). In his supplemental brief, appellant argues that two such strikes were improperly granted by the trial court.[1] Appellant contends he did not raise as a point of error on original submission the improper excusal of prospective juror Howard because *Batson* was not decided until after he had submitted his original brief and because the erroneous grant of a challenge for cause is considered harmless error when the State has peremptory challenges remaining at the conclusion of voir dire, and in this case, the State had three remaining peremptory challenges.[2]

■■■ Appellant argues that he has established a prima facie case of purposeful discrimination under *Batson*. He specifically argues that he is black, that the prosecutor successfully challenged for cause the black venirepersons, and that he has demonstrated that one, possibly two or more, of these strikes for cause was granted erroneously.[3] Since the challenges for cause were erroneously granted, according to appellant, they should be charged as peremptory strikes against the State. At that point, appellant argues, the district

---

1. In his first two points of error on original submission, appellant challenged the trial court's excusal, on the State's challenge for cause, of prospective juror Locke. We concluded the trial judge properly excluded Locke.

2. Appellant's statement as to preservation of error is incorrect. We stated in *Bell v. State*, 724 S.W.2d 780 (Tex.Cr.App.1986):

 In capital murder cases, if the trial court improperly sustains a State's challenge for cause and excludes a qualified juror, over a defendant's objection, reversible error arises regardless of whether the State has exhausted its peremptory challenges. This is because peremptory strikes are exercised after each prospective juror is questioned, under Art. 35.13, V.A.C.C.P., as opposed to after the entire panel is questioned in a non-capital case. [citations omitted].

 Thus, error is preserved in this instance if appellant objected to the trial court's grant of the State's challenge for cause.

3. Appellant refers to the challenges for cause which were granted as to venire members Locke and Howard. As noted in footnote one, supra, Locke was properly excluded for cause. We need not decide whether Howard was improperly excluded to resolve the *Batson* issue raised by appellant.

attorney *would have* exercised racially motivated peremptory challenges to remove from the jury panel those veniremen who were members of appellant's race.[4]

 We do not reach the merits of appellant's *Batson* claim because we find that appellant has failed to preserve this point of error for review. (See footnote four, supra.) In *Brown v. State,* 769 S.W.2d 565 (Tex.Cr.App.1989), and *Allen v. State,* 769 S.W.2d 563 (Tex.Cr.App.1989), we held that an appellant may not raise *Batson* error for the first time on appeal when there is no objection. It is of no consequence that the *Batson* decision was delivered subsequent to the time of an appellant's trial. See *Allen,* supra.

In his supplemental brief, appellant asserts that after the trial court granted the State's challenge for cause as to Howard he objected and raised the issue of whether he could get a fair trial if no blacks were allowed to sit on his jury. Appellant's specific objection upon the excusal of Howard was:

The Defense feels like excusing this juror for cause is a violation under *Adams [v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)] and *Witherspoon [v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)].

We also feel like from the testimony from this witness, her being a black person in this community, it further illustrates that the Defendant is not going to be able to get a fair trial in this community because of the blacks not being able to sit on the jury.

When viewed in a vacuum, this objection appears to raise the *Batson* issue, but our review of the record indicates that this objection was another opportunity for appellant's counsel to argue the necessity for a change of venue.[5] Appellant's objection also addressed his concern that blacks in the community did not want to sit on this particular jury because of their familiarity with appellant and/or the victim of the offense.[6] Appellant did not object to the

---

**4.** Appellant's *Batson* argument is patently meritless. In *Keeton v. State,* 724 S.W.2d 58 (Tex.Cr.App.1987), we stated that in order to invoke the protections afforded by *Batson,* a defendant must establish purposeful discrimination by showing that:

 1. he was a member of a cognizable racial group;

 2. the prosecutor had exercised peremptory challenges to remove from the venire members of the defendant's race; and

 3. the facts and any other relevant circumstances raise an inference that the prosecutor used peremptory challenges to exclude the veniremen on account of race.

*Keeton,* supra at 65. Reviewing these criteria, we find appellant has clearly not shown purposeful discrimination by the prosecutor in the use of his *peremptory strikes. Batson* protections apply when the State uses its peremptory challenges to deliberately deny jury participation to blacks. Appellant has not shown, nor does he argue, that the State used its peremptory challenges to strike blacks from his jury panel solely on account of their race. Appellant's speculation that the State *would have used* its peremptory challenges in a constitutionally impermissible way had the black venirepersons not been struck for cause does not raise an inference of purposeful discrimination by the prosecutor. *Batson,* therefore, is inapplicable to this cause.

**5.** On original submission in his twelfth point of error, appellant contended the trial court's overruling of his motion for change of venue, based in part upon racial tension in the community, was reversible error. We held that the trial court did not abuse its discretion in overruling the motion, and, thus, there was no error.

**6.** A portion of Howard's voir dire shows the extent to which she did not want to be a juror in this trial.

 MR. WRIGHT (Defense Counsel): If all the black people in this community asked to be excused, do you feel like [appellant] would get a fair trial?

 [HOWARD]: No, sir, I don't, but only if they didn't know him. If they don't know the people that is involved in it—if they didn't know then, you know, see them around, maybe they could do it.

 But I mean, you know, I been here nearly twenty-six years and I went to the laundromat. I have washed and I have talked with [the victim]. I know him.

 And I have seen this man [appellant] walk around and I just can't do it. I can't do it. This is too much on me, Your Honor. It is making me sick.

It is clear that appellant's objection was not in response to racially motivated peremptory strikes by the prosecutor but to Howard's emphatic pleas not to be seated on the jury.

racial composition of the petit jury or to the prosecutor's use of peremptory challenges. Thus, the *Batson* issue is not raised. C.f. *Henry v. State*, 729 S.W.2d 732 (Tex.Cr. App.1987). Appellant's fourteenth point of error is overruled.

In his fifteenth point of error (supplemental brief point of error number 2), appellant argues that he was denied the opportunity to determine if the statement of facts in his cause was complete and accurate. Appellant claims that to deny him this opportunity violates the due process provisions of Art. I, § 19 of the Texas Constitution and the Fifth and Fourteenth Amendments to the United States Constitution.

On June 11, 1986, this Court abated appellant's appeal because the trial court erred in failing to order the court reporter to transcribe the notes taken during the voir dire examination of several prospective jurors. *McGee v. State*, 711 S.W.2d 257 (Tex.Cr.App.1986). The supplemental statement of facts was then filed with this Court on February 6, 1987. Appellant thereafter filed a "Motion For An Evidenciary (sic) Hearing To Determine Completeness Of Record". Appellant stated in his motion that the supplemental statement of facts was filed with the Hardin County District Clerk's office and forwarded to this Court without the District Clerk giving written notice to him of completion of the record. Appellant moved for a hearing by the trial court to determine the accuracy and completeness of the supplemental record. This Court denied appellant's motion on April 27, 1987.

In appellant's supplemental brief, filed in this Court on June 8, 1987, he states that his motion for the evidentiary hearing was based upon the fact that the majority of the supplemental record was transcribed by a court reporter who was not present in court when the trial notes for the supplemental record were taken. As a result, appellant contends, he will not know if the statement of facts, *both the original and supplemental,* is the entire record until he has had an opportunity to question the court reporter who transcribed the *supplemental* statement of facts.[7]

At the time of appellant's trial, Art. 40.-09, V.A.C.C.P., was in effect. Article 40.-09, § 7, supra, specifically provided, in pertinent part, that:

Notice of completion of the record shall be made by the clerk by certified mail to the parties or their respective counsel. If neither files and presents to the court in writing any objection to the record, within fifteen days after the mailing of such notice and if the court has no objection to the record, he shall approve the same. If such objection be made ... the court shall set the matter down for hearing ...

Article 40.09, supra, was repealed when the new rules of appellate procedure were promulgated and became effective September 1, 1986. The supplemental record in this cause was filed with the district clerk on January 30, 1987, and was thereafter filed in this Court on February 6, 1987. Thus, the disposition of this point of error is controlled by the new rules of appellate procedure. See Order Implementing the Texas Rules of Appellate Procedure in Criminal Cases, entered by this Court and dated September 22, 1986.[8] Texas Rules of Court, State, p. 297 (West 1989).

Under the new rules of appellate procedure, appellant has no right to a hearing merely by raising an objection to the

---

7. Appellant's argument as to the original record is meritless. The record reflects he was afforded a hearing on his objections to the appellate record on January 17, 1985, as required by Art. 40.09, § 7, V.A.C.C.P.

8. The Order reads, in pertinent part:

It is Ordered by the Court of Criminal Appeals that as to posttrial, appellate and review procedures and steps completed or required to have been completed prior to September 1, 1986, the procedural provisions then in effect shall govern.

It is further Ordered that all procedural matters and requirements as to posttrial, appellate and review procedures and steps completed or required to have been completed on or after September 1, 1986, shall be governed by the procedural requirements of the Texas Rules of Appellate Procedure in criminal cases, regardless of when notice of appeal was given.

record. For relief, appellant must avail himself of Rule 50(e) or Rule 55(a), which he recognizes in his supplemental brief. Rule 50(e) provides a remedy for an appellant when the record or any portion thereof or the court reporter's notes and records have been lost or destroyed. Rule 55(a) provides for a hearing by the trial court to settle any dispute about the accuracy of the statement of facts.

We find that neither rule is applicable to appellant. Appellant fails to allege that portions of the record are lost, destroyed, or inaccurate. Appellant merely asserts that an evidentiary hearing is necessary so that he may determine whether the court reporter who transcribed the supplemental statement of facts was given the complete record transcribed by the substitute court reporter at trial and whether she was able to read the substitute court reporter's notes and make an accurate supplemental record. The original court reporter in this cause certified that each volume of the supplemental record is a true and accurate transcription of all the proceedings associated with appellant's trial, taken by her or under her direction. This certification raises the presumption that the transcription was accurate and the record is complete. Appellant fails to assert any inaccuracies in the record, and nothing in the record is disputed by the parties. Appellant fails to present any reason necessitating a hearing under the Rules of Appellate Procedure, and we hold he is not entitled to any such hearing.

Since appellant is not entitled to a hearing under the Rules of Appellate Procedure, there was no error in denying him an evidentiary hearing. Under the facts of this case, the appellate rules adequately protected appellant's due process and due course of law rights under the United States and Texas Constitutions. Appellant's fifteenth point of error is overruled.

Accordingly, appellant's motion for rehearing is in all other respects denied, and appellant's conviction is affirmed.

CLINTON, J., concurs in the result.

TEAGUE, J., concurs in disposition of appellant's fourteenth point of error. See *Teague v. Lane,* —— U.S. ——, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).