Edgar B. YUHL, Appellant,

v.

The STATE of Texas, Appellee.

Nos. B14–89–500–CR, B14–89–501–CR.

Court of Appeals of Texas, Houston (14th Dist.).

Jan. 11, 1990.

Brian W. Wice, Houston, for appellant.

Katherine Haden, Houston, for appellee.

Before MURPHY, ROBERTSON and SEARS, JJ.

## OPINION

ROBERTSON, Justice.

At appellant's consolidated trial on two charges of aggravated sexual assault of a child, the jury found appellant guilty of both charges. In the first case, involving two separate assaults on the same child, the jury assessed punishment at confinement for 60 years and a fine of $5,000 for each occurrence (No. 500). In the second

case, involving sexual assault of another child, the jury assessed confinement for 95 years and a $10,000 fine (No. 501). The sole issue on appeal in each case concerns appellant's alleged ineffective assistance of counsel. We consolidated these cases for disposition on appeal, and now affirm appellant's convictions.

The appellant, a sixty-five year old man, operated a booth in the Capitan Flea Market in Pasadena. He employed various young female sales personnel, two of whom were twelve year old Susan and thirteen year old Valerie. Each complainant testified concerning the sexual assaults committed upon her at various times by appellant at his home. Susan lived with appellant in his home for several months and Valerie was taken there by appellant on several occasions.

As is usual in charges of ineffective assistance of counsel, appellant points to several instances in which he contends trial counsel's performance was so unprofessional and deficient that, but for such deficiency, "the result of the outcome below as to either guilt/innocence or punishment would have been different."

■ Initially, the state contends that appellant's point of error is multifarious and therefore presents nothing for review, citing *McGee v. State*, 774 S.W.2d 229 (Tex. Crim.App.1989). The court of criminal appeals decided *McGee*, however, under the rules applicable prior to the adoption of the TEXAS RULES OF APPELLATE PROCEDURE on September 1, 1986. Whether courts will construe TEX.R.APP.PROC. 74(d) to prohibit multifarious points of error remains undecided. Having serious doubt that the rules prohibit multifariousness, we will address appellant's contention.

Because allegations of ineffective assistance of counsel are so frequently made in cases containing no record addressing the issue, it is wise to remember the words of the supreme court in *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (citations omitted):

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction ... and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

In *Strickland,* the supreme court also established a two-prong test by which to evaluate charges of ineffective assistance of counsel. First, the appellant must show that trial counsel's performance was deficient. 466 U.S. at 688, 104 S.Ct. at 2064. If such deficiency exists, the relevant inquiry becomes whether the deficient performance prejudiced appellant. *Id.* at 694, 104 S.Ct. at 2068.

Appellant's first argument complains of trial counsel's failure to file and argue a pre-trial motion to suppress certain evidence removed from appellant's home, including a box of photographs, several video tapes and a photograph album.

Police officers arrested appellant on September 13, 1988, as he drove his car into his home driveway with Susan as a passenger. The arrest stemmed from a warrant issued on the charge of sexual assault involving Valerie. One of the arresting officers, K.R. Reed, recognized Susan as a complainant in a 1986 investigation involving appellant which had not been pursued because Susan and her mother left town. He took Susan into protective custody and instructed her to get her clothes. She went to appellant's bedroom and retrieved them from a closet which also contained an adult man's clothing. Susan handed the officer a cardboard box, which she removed from the shelf in the closet, containing many pictures of nude children and children in various states of dress. Later, at the police station, when Susan told the officers of pornographic video tapes, the officers secured appellant's written consent to search his house. During this search, they re-

trieved some sixty video casette tapes, thirteen of which were pornographic. Evidently at the same time, although the record is unclear, the officers also seized a picture album containing pictures of appellant with females in various states of dress.

■ Appellant first argues that trial counsel was derelict in failing to file a motion to suppress all of the photographs. As this court has previously held, however, the mere filing of pre-trial motions, for the sake of appearance, does not in and of itself aid in the defense of an accused. *Sampson v. State*, 689 S.W.2d 498, 500 (Tex.App.—Houston [14th Dist.] 1985, no pet.). There, the appellant failed to show that a motion to suppress would have led to the suppression of any evidence. The same is true in this case. As to the cardboard box of pictures, Susan testified appellant had shown her the pictures. Their recovery was not the result of any search. Rather, Susan removed them from the closet where her clothes were hanging, in a bedroom she shared with appellant, and handed them to the police officer. We fail to discern any theory upon which the trial court could find the box of photographs inadmissible. Appellant does not articulate any basis for the exclusion of the photographs contained in the cardboard box. It is not surprising, therefore, that trial counsel had difficulty articulating an objection or that the trial court had no difficulty overruling the objection trial counsel did make.

■ Next, appellant argues trial counsel should have contested the validity of his written consent for the police officers to return to appellant's house and search, pointing out that it was the burden of the state to prove by clear and convincing evidence that the consent was freely and voluntarily obtained, that the consent was positive and unequivocal, and that there was no duress or coercion. Appellant argues that because he was in jail, charged with a first-degree felony, the consent was necessarily coercive, and the failure of trial counsel to challenge the voluntariness of his client's purported consent was inexcusable. We do not agree. The record simply does not support appellant's allegations. Appellant himself testified that he signed a consent for the officers to return to his home to search. It is not at all unreasonable, but to the contrary is most reasonable, to assume that trial counsel was well aware that there was, in truth, no factual basis for a finding that the consent to search was not freely and voluntarily given.

■ Appellant next argues that because the judge ultimately changed her ruling and withdrew the pornographic videos from the jury's consideration, trial counsel was derelict for failing to seek "a stern admonition from the trial court instructing the jury not to consider the tapes for any purpose." Again, the record does not support this contention.

Susan testified that appellant, on numerous occasions, had shown her video tapes of movies entitled TABU II and III and Little Girls in Blue, parts one and two. The evidence shows these tapes were pornographic. The trial court admitted these four tapes into evidence over trial counsel's objection, but immediately thereafter the trial judge reversed her ruling, stating:

> I am not going to have this jury back there playing video tapes. Because of that I am going to sustain your objection. I think they are admissible, but I think that this officer has testified enough as to the contents of it and I am going to change my ruling because I have no desire to sit around here the rest of the week while that jury sits back there playing video tapes.

In the presence of the jury the judge stated:

> Very well. Thank you for calling my attention to that, Mr. Crow. Ladies and gentlemen of the jury, I have changed my ruling I made previously admitting those tapes. They are not admitted essentially because I don't think there is anything to be served by having a whole bunch of tapes to be played around here. Go ahead.

Thus, it is clear that appellant's attempt to fault trial counsel for not seeking "a

stern admonition from the trial court instructing the jury not to consider the tapes for any purpose" is hollow. The trial court agreed the tapes were admissible but refused to have them viewed by the jury. Furthermore, the trial court could not have instructed the jury to not consider the tapes because Susan, describing and naming them, had testified appellant showed them to her. Finally, what we have said concerning the box of pictures and the video tapes applies equally well to the photo album because the officers retrieved it based on a consensual search and because Susan testified as to its contents based on personal knowledge. Based on our review of the evidence, appellant has failed to satisfy the first prong of the *Strickland* test regarding his argument on motions to suppress.

Appellant's second argument is that trial counsel failed to preserve error for appellate review. He first points to trial counsel's failure to state any grounds for his objections to the cardboard box of photographs. As we have pointed out, appellant, even by hindsight, has not articulated an adequate basis for objection to the pictures.

Appellant's next contention concerning preservation of error is that trial counsel failed "to object to the repeated allusions made by complainant Valerie ... to extraneous offenses allegedly committed by the appellant." The "extraneous offenses" to which appellant refers arose during the direct examination of Valerie. Through her testimony, the prosecutor had developed the progression from Valerie's initial employment by appellant to work in the flea market, to the times when appellant, with the consent of her parents that he would bring Valerie home following work, would leave the flea market early and take Valerie to his home. She stated that at first appellant would show her old time video taped comedies and give her some wine. On subsequent visits to his home, they drank more wine and appellant began fondling her breasts as they watched movies. The questions then proceeded to January 24, 1988, the date of the first charged offense. The applicable portions of Valerie's testimony follow. (The italicized portions of the answers are those which appellant contends refer to extraneous offenses).

A. Yes, he did. I don't know if he understood as well but he listened real well and it was always good to have someone to talk to, so I had a lot of trust in him and—okay, he asked me—he would touch me. We were watching the movie again and he would reach inside my shirt and rub me on the breasts and I was uncomfortable and I am sure I stated so, you know, but I didn't—you know, totally say no, just get away from me. I did say well, I am very uncomfortable, you know.

Q. Okay, did you have a chance to go to bed with him on January 24th, 1988?

A. Yes. We went to the bedroom and he asked me to undress. I was very shy, you know, and I have felt that maybe, you know—I felt uncomfortable and I felt like maybe I might lose my job if I didn't go along with it and *I didn't think there was anything wrong with it because it seemed all the girls went along with it.*

Q. What was the impression you had—what other girls worked at the flea market at that time?

A. Well, I never—

Q. How many girls were there approximately back then that worked there?

A. Two. I was the only one that worked there but before me there had been other girls I had met that told me they had worked there and their ages were all fifteen and below.

Q. Okay, and other than the fact that you were under age and legally couldn't give consent, did you basically agree to have sex with him?

A. Yes.

Q. Okay, and first of all on that date—on the 24th of January did he get you undressed—completely naked?

A. Yes.

Q. Okay, did he place his penis inside your vagina on that date?

A. I don't believe so on that date, no.

Q. Okay, what happened on that date?

A. He just touched me. It was mostly fingering. I was a virgin and I'm sure I know I was too small for him, you know, but he said he was just getting ready and that I wasn't quite ready for anything else, you know.

Q. Did he on that date, January 24th, 1988, did he place his finger inside your female sexual organ?

A. Yes.

. . . . .

Q. Okay, and how did you feel, you know, about having sex with a guy that was in his sixties?

A. I don't relate a whole lot of feelings to it. I was very confused as to what was right and wrong. I am sure I went over it in my head several times. I was very uncomfortable and I was very confused.

. . . . .

Q. Let me direct your attention to the date of January 31st and ask do you remember having a chance to go over to his house on January 31st, 1988?

A. Okay, yes. I went over there and—

Q. And what happened?

A. All right, pretty much the same way. It got to where we would go directly to his room. I would undress completely voluntarily and this time he did have sex with me. He did put his penis in my vagina and like a couple of different positions. It was not very long, of course. I was in pain.

Q. All right, on that date, January 31st, do you remember him placing his mouth on your female sexual organ?

A. Oh, yes, I remember that. I think that was one of the first things he did to relax me, you know. I was very shy and he did, yes.

Q. Let me direct your attention to the month of March, 1988 and ask during that month did you—the same thing. Did you have occasion to go over to his house during that month?

A. March, yeah—yeah, I think in early March.

Q. And do you remember the last time that anything happened, approximately?

A. Approximately I really can't remember exactly. I know it ended—it didn't last very long. It ended after maybe two months. I got a boy friend and we put a stop to it.

. . . . .

Q. How did Mr. Yuhl act as far as your discontinuing anything?

A. He was fine. He said I understand. We talked about it. We were going to go to his house for a while. It was totally innocent and I told him I have a boy friend and I am not going to be unfaithful to him. I care about him. Eddie said That's fine, I understand. I'm glad we can talk about it, and we went by and had some wine and everything was fine but I was—I never saw him much any more. I was alone there at the flea market every weekend. I felt kind of hurt because I thought we had like a friendship, you know, but after that it was pretty much him and Susan and that was pretty much it—the end of it.

Q. How did he act as far as Susan? Did it appear to be a father and daughter?

A. No, Eddie and Susan and they had a relationship, you know, to where they—in the public they were pretty much, you know—they were affectionate like hugging and she would sit on his lap a lot and any time she needed anything like money or anything like that she always came to him, but as far as, you know, did I see anything really obscene in public, no.

Q. Why did you tell anybody about Mr. Yuhl?

A. Well, I didn't start off having intentions to but I ended up because I realized, you know—

Q. What I mean by that question, don't refer to anybody else or what anyone told you. I am just talking about yourself.

Q. Okay. Why?

A. Yes. Okay, I came to the decision to go ahead and, you know, tell the officers about Eddie because I realized, you know, that he was—you know, *he wasn't just hurting me. He was hurting other people too, you know.*

Q. Did you just march down to the police station and walk in and say I want to report a crime or did they come to you?

A. No. I told my parents you know, and I went to them. Nobody came to me. I went to them, but I decided when I was in the police station to tell them all about Eddie.

Q. At the time when all of this was going on did you think anything was wrong—that it was wrong?

A. No, because you don't think about that, you know. You just—when you are this young you don't think about that and *you think well, everybody else is doing it and the parents see it* and, you know, so it must be okay.

Q. Why didn't you tell your mother before then?

A. I didn't tell my mother because we didn't have a whole lot of—a good relationship and we didn't talk about anything and something happened to me a long time ago and nothing had been done about it and I felt like nothing would be done about this either, so there was no need to tell anybody.

Q. What was your relationship with your father at the time?

A. There wasn't much of a relationship. We were very cold towards each other.

.    .    .    .    .

Q. How is Martin (at the time of trial Valerie had married—Martin was her husband) dealing with this whole court process?

A. He is having a hard time understanding it. He feels everything I did was totally voluntary and he doesn't understand why we are trying to do something to Eddie *other than maybe he has done something to someone younger than I.*

■ We do not agree that the italicized portion of the complainant's answers necessarily refer to extraneous offenses. We agree with the state that the jury could interpret the complained of statements as meaning that sexual activity was fairly normal among Valerie's peers—not that all the other young girls engaged in sexual activity with appellant. Also, as pointed out by the state, the complained of statements, when considered along with the remainder of her testimony on the issue, dealt with Valerie's state of mind.

Appellant argues that to believe trial counsel may have thought the complained of testimony was not subject to exclusion "is to ignore the threshold question of trial counsel's responsibility." He quotes a sentence from the opinion of the San Antonio Court of Appeals in *Mitchell v. State*, 762 S.W.2d 916, 920 (Tex.App.—San Antonio 1988, pet. ref'd) that "[w]hile suppression of evidence is left to the court, it is the duty of defense attorney to attempt through all legal means to have evidence detrimental to his client suppressed." Appellant paints with too broad a brush. While this theory may be laudable, if we construe it to require an attorney to do that which his legal training and knowledge advises against, then our justice system has reached a new low.

■ Those italicized portions of the complained of testimony that appellant "was hurting other people too" and that appellant "has done something to someone younger than I" appear to us to be referring to Susan, the complainant in the companion case which was tried jointly with the case involving Valerie. We fail to understand how such testimony would, under these circumstances, relate to an extraneous offense. Again, appellant has been unable to show deficient performance by trial counsel, thus failing to satisfy the first prong of the *Strickland* test.

Appellant's third argument alleges that trial counsel's performance was deficient because of his failure to object to improper final argument. To support his contention, appellant points to four instances in the prosecutor's argument during the guilt/in-

nocence phase of the trial and two instances during the punishment phase.

■ The first isolated argument occurred just as the prosecutor began his opening argument. He admonished the jury that they were the judges of the facts and that he did not think they would take their burden lightly. He then stated "I think the evidence is overwhelming to find Mr. Yuhl guilty." This was clearly an expression of the prosecutor's opinion *based upon the evidence* and, as such, was proper. *McKay v. State*, 707 S.W.2d 23, 37 (Tex.Crim.App.1985).

The next instance appellant points to is the italicized portion of the following argument, quoted at length to understand the context in which it was made:

He thinks he is smarter than the system. He thinks he can fool you. That's how these people are. You pick your victims dumb and young and you won't get hung. Do you think these kind of guys go out and try to find some intelligent child from a public school and mess with them? Hell no. You find some child who is dependent. Dependency. That's the key. You are the only person they have got. Their parents don't care a damned thing about you. *Her mother doesn't believe her. Give me another break. My only regret is that her mother and father are not sitting there in his chair and we will work on them when this is over.*

The trial court sustained appellant's objection to this argument. Appellant now contends the failure of trial counsel to seek either an instruction to disregard or a mistrial was such a serious deficiency in performance as to amount to ineffective assistance of counsel. While appellant is correct that the failure of trial counsel to seek an instruction and a mistrial waived the complaint for appellate review, we do not agree that such failure amounts to ineffective assistance of counsel.

■ First, Susan testified that she had told her mother of some of appellant's indiscretions and that her mother did not believe her. Second, trial counsel had already argued to the jury, in attacking the credibility of Susan, that her mother would not even believe her. He also asked, rhetorically, "Did you ever wonder why a mother wouldn't believe her teenage daughter?" Based upon the evidence of Susan's parent's neglect during a critical period of her adolescence, it appears that the portion of the prosecutor's argument stating that he regretted they (the parents) were not then sitting in the defendant's chair was a reasonable deduction from the evidence. The only vice in the argument which we discern is that portion where the prosecutor stated "we will work on them when this is over." This portion of the argument, however, was not so extreme or manifestly improper that it would call for reversal even if trial counsel had properly preserved the error.

■ Appellant next complains of the italicized portion of the following argument, again quoted at length to understand the context in which it was made:

There are difference (sic) types of evidence in this case. Basically it's the child cries—the child world against adults. We have psychological testimony. Suicide. Why do I feel so dirty? Why do I feel so grown up? Medical testimony. No hymen left. Not just a tear in the hymen. This child had no hymen left. Non virginal. Physical evidence. The photos. And the interesting thing is Mr. Crow was talking about the old tactic of the quality of evidence versus quantity. You heard his own client talking about other types of evidence that was never shown to you and you will never get to see. He described certain things in the photo album. He was asked that. Under garments on other girls. I never showed you that because it didn't involve this complainant. *I showed you only the relevant, admissible evidence that relates to this defendant.* The only pictures you saw were the ones she said that she could identify. A little girl standing by a stair case and sitting on the bed smoking a cigarette. You look at those pictures. That's exactly what's in there. Why would Susan say that—a child of eighty IQ say this man told her that he had a maid that

used to give him a bath when he was a child and then go on and say—another little story he told her was how he used to dip the pony tail in ink and tied the shoe laces. The only ones he is going to admit to is the harmless stories. Just like a little boy up there testifying. Where would she come up with that—eighty IQ? She is going to make it all up? He picks and chooses what he wants to believe and what he things (sic) you're going to believe.

At trial, Susan testified that appellant showed her various pictures from the box of photographs of little girls—one where "she was naked holding a cigarette in an ash tray laying down on the couch and there was one where she was standing by the stairs." Concerning the stories appellant told her about his childhood, Susan testified:

Well, I remember one story he told me about when he was a little kid he was living good. He had a maid or something like that and he would—she would wash his body all over and down there on his penis and make him feel good and stuff like that and how sneaky he was. This girl had long blond hair and ink in the bottom of her hair and he talked about tying tennis shoes to the chair and something like that.

While appellant was testifying, he denied that he had ever shown any of the pictures contained in the box or any pornographic films to Susan. On cross-examination, he denied that he had ever taken pictures of children under the age of seventeen in skimpy clothing with his arm around them. The prosecutor then exhibited a photograph album to him—which he recognized as his—and asked him about some pictures where the female was wearing only undergarments and appellant had his arm around her "dancing or something." Appellant's answers were equivocal. The state, however, did not offer the photographs into evidence. Appellant denied that he had ever told Susan the story she related to the jury. He did admit, however, that he told her the story of dipping the girl's hair in the ink well and tying her shoe strings to a

chair, explaining that "I was a bad little boy. I hated little girls."

As we view this argument, it was a legitimate comment on the evidence admitted during the trial and was not objectionable. Appellant's present contention, which compares this argument to ones which have been condemned as inviting the jury to surmise that there was other inadmissible evidence which, if revealed, would justify a guilty verdict, is not impressive.

■ The final argument during the guilt phase of which appellant complains is the italicized portion of the following:

*Valerie didn't lie to you.* Why would she say she consented? Again, consent is not the issue. It's a child under the age of fourteen. Since that is the law, she could consent all day long and it's still a crime. Why would she confide in this sixty-five year old man about having been pregnant or suspected of having been pregnant if there was not a relationship there. That's the sort of thing a young girl tells her girl friend. Hey, I'm pregnant. She went to him.

This argument was in answer to a defense argument wherein trial counsel repeatedly attacked the credibility of Valerie, attempting to totally discredit her testimony as unworthy of belief. As such, it was not improper.

■ Two separate instances of argument during the punishment phase of the trial are isolated by appellant as being improper. First, the prosecutor argued:

What price do you put and (sic) a child's innocence? Two years ago each of you were in your homes or on your jobs doing whatever you do. There was a girl living with him doing what she did on a day to day basis.

Appellant's trial counsel objected on the basis of no evidence, but the trial court ruled "The jury will recall the evidence as the jury recalls it." The argument was clearly based on the evidence and the court's ruling was correct.

■ Next, appellant complains of the following argument by the prosecutor:

When this trial is over all of you go out into society. He goes into society and goes to prison for a short number of years and gets out or something. I ask you, ladies and gentlemen of the jury, you owe a duty to the rest of the people of this county to put him away for as long as you can....

Appellant compares this argument to that condemned by Texas courts as telling the jury that the citizens of the county are demanding punishment. *Cortez v. State,* 683 S.W.2d 419, 420 (Tex.Crim.App.1984). We do not agree with any such comparison. It is beyond argument that this was a legitimate plea for law enforcement.

We find, therefore, that appellant again failed to meet the first prong of the *Strickland* test concerning trial counsel's failure to object to improper final argument. As the previous discussion makes clear, such failure to object did not amount to ineffective assistance of counsel.

Finally appellant discusses what he labels "other failings of trial counsel." Under this heading, he discusses two occurrences during the presentation of evidence. After examining each instance, we find them unworthy of discussion.

We find that appellant received effective assistance of counsel. We affirm the judgment of the trial court.