**AFFIRM; and Opinion Filed December 16, 2013.**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-12-01631-CR**

**DANIEL VILLEGAS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 6**
**Dallas County, Texas**
**Trial Court Cause No. F10-51680-X**

## MEMORANDUM OPINION

Before Justices Francis, Lang-Miers, and Fillmore
Opinion by Justice Lang-Miers

The State charged Daniel Villegas with possession with intent to deliver cocaine in an amount of 400 grams or more. The range of punishment for the offense was 15 to 99 years' or life imprisonment and a fine not to exceed $250,000. TEX. HEALTH & SAFETY CODE ANN. § 481.112(f) (West 2010). Appellant pleaded guilty and asked the jury to assess the minimum punishment. After hearing evidence, the jury sentenced appellant to 30 years in prison.

In two issues on appeal, appellant argues that he was deprived of his right to counsel when the trial court sustained the State's objection to a portion of defense counsel's closing argument, and the trial court reversibly erred by failing to include an instruction on extraneous offenses in the jury charge. We issue this memorandum opinion pursuant to Texas Rule of Appellate Procedure 47.4 because the issues are settled. We affirm the trial court's judgment.

BACKGROUND

Dallas police officers conducted a knock-and-talk at a house in southwest Dallas in response to a complaint that drugs were being sold out of the house. The house belonged to the girlfriend of appellant's uncle. The officers received permission from the girlfriend to search the house and garage and found close to three kilograms of cocaine, over a pound of marijuana, materials for packaging the drugs, scales for weighing the drugs, and a handgun.

The officers arrested appellant, who gave a voluntary statement admitting that he was a "drug runner" for "the cartel" and had driven the cocaine from Laredo to Dallas in his van. He said he gets a call from someone and then meets that person somewhere in Dallas and that the place was different each time, implying that this was not the first time he delivered cocaine to Dallas. He said "when [he] first saw them in person they were like we're gonna need pictures of your wife and kids cause you've seen us . . . ." He said he could go out to eat, and he would get a call asking "was the food good at such place. I'll go to Hooters. They'll be like was the food good at Hooters." He said, "I'm telling you man they (inaudible) to most people. I've seen them kill. I've seen them kill a pregnant woman in Mexico. To make . . . to make a point to us. . . . Yeah! I'm telling you they, they, they . . . . to make a point they were like . . . cause . . . she failed to, uh, to call something in when she saw some (inaudible) or something and so they . . . they stabbed her in her stomach." When the officer told appellant that it was "risky" to do what he was doing for $1500, appellant said, "Yeah, but I mean there ain't no other job that pays this, so . . . ." Appellant said the cartel gave him the marijuana to smoke because they knew he liked smoking it. Appellant asked the officer for a receipt for the cocaine.

At the punishment trial, the State presented the testimony of a specially trained narcotics officer who testified that he searched the garage of the house and saw "narcotics-style packaging" that was commonly used to "bring in bales of marijuana" before it was ripped "apart

–2–

to separate for sale." He pointed out to the jury the marijuana stems still stuck to the packaging. He also saw a "large-style scale used to weigh narcotics . . . [t]hat . . . you find in houses that deal with more weight than your regular guy selling dime bags of weed on the street." He found the pound of marijuana inside a charcoal bag. He testified that based on the amount of packaging, he believed "[a]t one time there was a lot more in the garage."

The State also presented expert testimony from a narcotics detective in the Irving Police Department. He testified that the distribution of drugs into the United States is "a multi-multibillion-dollar enterprise" and is run "like anybody would run your own business." He compared a kilo of cocaine to a restaurant-sized box of Sweet 'N Low with one-gram packages inside. He said if the cocaine is "cut" with another product, "[i]nstead of one box of Sweet 'N Low, imagine six boxes. And all of that, that can be distributed out from one package of cocaine." He described "[o]ne Sweet 'N Low packet" as worth $100 in street value and one kilo as worth $100,000. And he estimated that one kilo of cocaine when cut would be about 32,000 individual quarter-gram packets on the street.

The expert looked at the pictures from the house in this case and described it as "a large stash house." He looked at the lab report showing the purity levels (73% and 78%) of the cocaine seized from the house and described it as "very good."

Appellant testified at the punishment trial that he ran away from home when he was 15 and moved to Laredo where he lived with his uncles. His cousin got him involved in the drug business when appellant was about 20 years old. He said the job opportunities in Laredo were either working on an oil rig or running drugs. He said he was too young and inexperienced to work on an oil rig and liked "very much" the money he could make running drugs. At first, he ran errands that did not involve anything illegal. When he was about 24, he began taking the cocaine to Dallas. He said he picked up the cocaine in Laredo from a different person each time,

put the cocaine in his van, and drove it to Dallas. He said he used his uncle's girlfriend's house in Dallas because "[i]t would be easier for me. She had a garage. You know. She was really never there at the house. She would always be working or something. I had more – I want to say opportunities to do what I had to do before she got home or anything like that."

Appellant testified that he would get a call about where to take the cocaine and the person he delivered it to paid him $500 per kilo. He said "every time I come up here, I get a call from a different person," indicating he had delivered cocaine to Dallas more than once. He testified that he knew about cartels, "what cartels do, what they're about, what's going on south of the border[.]" He said when he made the decision to start working his way up in the cartel, he already had a wife and a child. He said he "very much" liked the money he could make. He testified that he saw the "cars, money" and was motivated by "I guess, you know, just the money." He said it was not "odd" for students in Laredo to be drug runners. He said he did not really think about the consequences at the time.

## DEPRIVATION OF RIGHT TO COUNSEL

In issue one, appellant argues that he was deprived of his right to counsel when the trial court sustained the State's objection to a portion of his closing argument:

> [DEFENSE COUNSEL]: Is he evil? Is Daniel Villegas evil? Should he do more time than murderers and rapists and assaulters do?
>
> [THE STATE]: Judge, I object. Legally, that's incorrect.
>
> THE COURT: Sustained.
>
> [THE STATE]: Your Honor, ask the jury to disregard.
>
> THE COURT: The jury is so instructed.
>
> [DEFENSE COUNSEL]: Well, the range of punishment for certain cases is five to life.
>
> [THE STATE]: Judge, again, I think –
>
> [DEFENSE COUNSEL]: It's the law, Judge.

[THE STATE]: There's aggravated offenses. He's gonna make a misstatement.

THE COURT: Overruled.

[DEFENSE COUNSEL]: The range of punishment, the minimum is 15 years. That's a lot of time. If they want to say there's other people that do murders or other people doing less time, whatever. But I could tell you – I can tell you 15 years is a lot of time.

On appeal, appellant argues that he was attempting to respond to the State's argument describing him "and people like him as murderers," was attempting "to refute the evil nature ascribed to him by the State," and "was questioning whether Appellant should receive a sentence similar to those people who commit violent crimes." He contends he was responding specifically to the following portion of the State's argument:

> Trusted individuals talk about going to Mexico and seeing murders. That's this man. . . . [H]ow many times we're worried about going out of our house because someone on this stuff is gonna hurt somebody? . . . [W]hat message do we send to those people in Laredo who say, "No, I won't get a job. I'm gonna run drugs for cartels because killing people and threatening people . . . .

**Standard of Review**

A trial court may not prevent defense counsel from making an argument counsel is entitled to make. *Lemos v. State*, 130 S.W.3d 888, 892 (Tex. App.—El Paso 2004, no pet.) (citing *McGee v. State*, 774 S.W.2d 229, 238 (Tex. Crim. App. 1989)). To do so can be a denial of the right to counsel. *Riles v. State*, 595 S.W.2d 858, 861 (Tex. Crim. App. 1980); *Lemos*, 130 S.W.3d at 892. Even assuming, without deciding, that the trial court erred and that appellant preserved any error for review, *see Dean v. State*, 481 S.W.2d 903, 903–04 (Tex. Crim. App. 1972) (explaining defendant's need to show trial court what he would have told jury but for court's ruling), we must review the record to determine whether the error was harmless beyond a reasonable doubt. TEX. R. APP. P. 44.2(a) (stating reversal required unless reviewing court determines beyond reasonable doubt that error did not contribute to punishment); *Snowden v. State*, 353 S.W.3d 815, 821 (Tex. Crim. App. 2011) (explaining harmless-error inquiry).

**Analysis**

Appellant admitted guilt. The only issue before the jury was what punishment to assess. The minimum punishment was 15 years, and that is what defense counsel argued was appropriate in this case. Although defense counsel was not permitted to argue that appellant should receive less time than "murderers, rapists, and assaulters," where, in some cases, the minimum punishment could be five years, he nevertheless made his point that 15 years was a lot of time for this drug offense. He told the jury:

> The minimum is 15 years. You kidding me? There was about 12 people yesterday that said, "That's crazy, I don't care how much drugs there are, the fact the minimum is 15 years and we have no choice. We don't agree with that." That's one-fifth of the jurors that came in here. Well, they're not here. Y'all are sworn to uphold your oath and consider the whole range of punishment. But to think and insult your intelligence that what you do here is gonna have an impact in Laredo or 21-year-old kid in Laredo that wants 1500 bucks to take three kilos tomorrow, that's insulting.

Counsel repeatedly impressed upon the jury how long a 15-year sentence is and what could happen in the life of appellant's family during that 15 years. He explained how appellant had taken responsibility for his conduct, had changed since being arrested, and had shown that "he can do right. He can be a father. He can be a husband. He can be a benefit to society, pay his taxes, do the things that citizens do." He urged the jury to assess the minimum, 15 years.

In its closing argument, the State argued that "[t]his is all about money. Not about threats." It argued that appellant made a conscious decision to become involved in a cartel even though he had a wife and children. It argued that appellant knew the consequences of his actions, and chose that lifestyle. But the State also told the jury, "No one's gonna ask you for a life sentence in this case. This is not a life case." Instead, the State asked the jury to send a message:

> What you do do today sends a message. . . . Dallas County, come through, you get the minimum. They all have families. They're making that decision and it's gonna hurt other people. That's not stopping them. What is stopping them? One thing: We, as a society. . . . But if the message goes out . . . . Don't go to Collin or Tarrant County. You'll get popped there. You send a message. You send a

–6–

message. You send a message to the people fighting this addiction who are dealing with their family members. This stuff's hitting our streets. Send a message to anybody considering going down this path like this man did. Easy money. These are lives lost.

In concluding its argument, the State argued, "[T]his is not a life case. This is a protect-your-community case. This is a send-a-message-to-the-community case." The State asked the jury to "give him 10 years per kilo." And that is what the jury did.

The punishment assessed by the jury, 30 years, is at the low end of the punishment range for this offense. Having reviewed the record in a neutral light, we are satisfied beyond a reasonable doubt that any error by the trial court in sustaining the State's objection to a portion of appellant's closing argument did not contribute to the jury's assessment of punishment in this case. We resolve issue one against appellant.

## EXTRANEOUS OFFENSE JURY INSTRUCTION

In issue two, appellant argues that the trial court erred by failing to sua sponte instruct the jury about the State's burden of proof for extraneous offenses. He argues that the State presented evidence that he began "running drugs when he was . . . 20–21 years old," "discussed the larger amounts of cocaine that were transported by Appellant," and "elicited testimony that Appellant was a member of a cartel" and "worked his way up in the organization." He contends that the error resulted in egregious harm to him because the "jury was never instructed to determine if the State proved the extraneous offenses beyond a reasonable doubt."

### Standard of Review

When an appellant complains of jury charge error, we first determine whether there is error in the charge. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). If there is, we next determine whether the appellant suffered harm as a result of the error. *Id*. If the appellant did not request a proper instruction or object to its omission, as is the case here, then his burden on appeal is to show the error caused him egregious harm. *Id*. Egregious

–7–

harm results from errors that affect "the very basis of the case," deprive the appellant of a "valuable right," or "vitally affect a defensive theory." *Id*. at 172. When reviewing a record for harm, we may consider the charge, the state of the evidence, arguments of counsel, and "any other relevant information contained in the record as a whole." *Gelinas v. State*, 398 S.W.3d 703, 705–06 (Tex. Crim. App. 2013) (citing *Almanza*, 686 S.W.2d at 171).

## Analysis

The State concedes that the trial court erred by failing to include an extraneous offense instruction in the jury charge, but argues that the error was harmless. We agree.

Appellant testified about how he got involved with the cartel when he was young and worked his way up to drug runner in a matter of three or four years. In his statement to the police and in his trial testimony, he implied that he had delivered cocaine from Laredo to Dallas more than once and that the amount was always three kilograms. In other words, in his own testimony or voluntary statement, appellant admitted the very extraneous offenses about which he complains. Under these circumstances, we conclude that appellant has not shown how the failure to include a reasonable doubt instruction relating to the extraneous offenses caused him egregious harm. *See Elder v. State*, 100 S.W.3d 32, 35 (Tex. App.—Eastland 2002, pet. ref'd) (concluding there was no basis for a reasonable doubt instruction when the appellant admits the extraneous offenses). We resolve issue two against appellant.

## CONCLUSION

We affirm the trial court's judgment.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

121631F.U05

–8–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DANIEL VILLEGAS, Appellant

No. 05-12-01631-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 6, Dallas County, Texas
Trial Court Cause No. F10-51680-X.
Opinion delivered by Justice Lang-Miers,
Justices Francis and Fillmore participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 16th day of December, 2013.

/Elizabeth Lang-Miers/

ELIZABETH LANG-MIERS
JUSTICE