ACCEPTED
07-15-00118
SEVENTH COURT OF APPEALS
AMARILLO, TEXAS
9/28/2015 10:50:55 PM
Vivian Long, Clerk

No. 07-15-00118-CR

FILED IN
7th COURT OF APPEALS
AMARILLO, TEXAS
9/28/2015 10:50:55 PM
VIVIAN LONG
CLERK

# In the Court of Appeals for the Seventh District of Texas
## Amarillo

_____

JACOB JORDANN BRIGHT,
*Appellant,*

v.

THE STATE OF TEXAS,
*Appellee.*

_____

On Appeal from Criminal District Court No. 1, Tarrant County, Texas, The Honorable Elizabeth Beach Presiding

_____

APPELLANT'S INITIAL BRIEF

_____

WILLIAM R. BIGGS
WILLIAM R. BIGGS, PLLC
115 W. 2nd St., Suite 202
Fort Worth, TX 76102
817.332.3822 (t)
817.332.2763 (f)
wbiggs@williambiggslaw.com
TX Bar No. 24052832

ORAL ARGUMENT IS REQUESTED

# IDENTITY OF PARTIES AND COUNSEL

The number and style of the case in the court below is as follows:

*State of Texas v. Jacob Jordann Bright,* Cause No. 1306330D, Criminal District Court No. 1, Tarrant County, TX.

| | |
|---|---|
| Criminal District Judge | Hon. Elizabeth Beach |
| Defendant-Appellant | Jacob Jordann Bright |
| Prosecution-Appellee | The State of Texas |
| Defense Counsel | William R. Biggs (appeal)<br>115 W. 2nd St., Suite 202<br>Fort Worth, TX 76102<br><br>William H. Ray (trial)<br>512 Main St., Suite 308<br>Fort Worth, TX 76102<br><br>Stephen E. Gordon (trial)<br>2101 Moneda St.<br>Fort Worth, TX 76117 |
| Prosecution-Appellee | Sharen Wilson<br>Tarrant County District Attorney<br>401 W. Belknap, 4th Floor<br>Fort Worth, TX 76196<br><br>Assistant District Attorneys:<br><br>Steve Gebhardt    (trial)<br>Michele Hartman (trial) |

i

## TABLE OF CONTENTS

PAGE

IDENTITY OF PARTIES AND COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . 2

ISSUE PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

I.     The evidence was legally insufficient to support a finding of guilt on
       capital murder.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

II.    The trial court provided erroneous instructions to the jury which
       constitute reversible error... . . . . . . . . . . . . . . . . . . . . . . . 27

III.   The trial court erred by declining to exclude from evidence   text
       messages from "Shawn," in violation of TEX. R. EVID. 403. . . . .   36

PRAYER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . 44

CERTIFICATE OF SERVICE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

# INDEX OF AUTHORITIES

PAGE

## UNITED STATES SUPREME COURT

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979).. . . . . . . . . . . . . . . . . 22

## COURT OF CRIMINAL APPEALS CASES

*Almanza v. State*, 686 S.W. 2d 157, 171 (Tex. Crim. App. 1985)*.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 32, 33

*Crabtree v. State*, 389 S.W. 3d 820 (Tex. Crim. App. 2012)*.* . . . . . . . . . 22

*Dougherty v State*, 188 S.W. 3d 670, 2006 WL 475802 at *1 (Tex. Crim. App. 2006)*.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Fuentes v. State*, 991 S.W. 2d 267, 272 (Tex. Crm. App. 1999)*.* . . . 25*,* 28

*Gear v. State*, 340 S.W.3d 743, 749 (Tex. Crim. App. 2011)*..* . . . . . . . . 23

*Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App.2007)*.* . . . . . . . . . . 23

*King v. State*, 953 S.W. 2d 2266, 271 (Tex. Crim. App. 1997)*.* . . . . . . . 37

*McGee v. State*, 774 S.W. 2d 229, 234 (Tex. Crim. App. 1989)*..* . . . . . . 24

*Medina v. State*, 7 S.W. 3d 633, 640 (Tex. Crim. App. 1999)*.* . . . . . . . . 32

*Moff v. State*, 131 S.W.3d 485, 488-89 (Tex. Crim. App. 2004)*.* . . . . . . 22

*Nava v. State*, 415 S.W. 3d 289, 298 (Tex. Crim. App. 2013)*.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 32, 33, 34

PAGE

*Paulson v. State*, 28 S.W. 3d 570, 572 (Tex. Crim. App. 2000). . . . . . . 35

*Riles v. State*, 595 S.W. 2d 858, 862 (Tex. Crim. App. 1980). . . . . . 24, 25

*Schmutz v. State*, 440 S.W. 3d 29, 39 (Tex. Crim. App. 2014). . . . . . . . 37

*Soloman v State*, 49 S.W. 3d 345, 366 (Tex. Crim. App. 2001). . . . 37, 40

*Taylor v. State*, 332 S.W. 3d 483, 488 (Tex. Crim. App. 2011). . . . . 27, 28

*Threadgill v. State*, 146 S.W. 3d 654, 655 (Tex. Crim. App. 2004). 29, 30

*Torres v. State*, 81 S.W. 3d 758, 760 (Tex. Crim. App. 2002). . . . . . . . . 36


COURTS OF APPEALS CASES

*Chaney v. State*, 314 S.W. 3d 561, 568-573 (Tex. App.—Amarillo
2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Dougherty v. State*, 2007 Tex App. LEXIS 4449 (Tex. App. Houston 1st
Dist., June 7, 2007) (unpublished). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Matthews v. State*, 2015 Tex. App. LEXIS 6861 (Tex. App.—FortWorth,
July 2, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*Montgomery v. State*, 198 S.W. 3d 67, 79 (Tex. App.—Fort Worth, 2006,
*pet. ref'd*). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Vosberg v. State*, 80 S.W. 3d 320, 324 (Tex.App.—FortWorth, 2002, *pet.
ref'd.*). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 35, 36

# STATUTES AND RULES

TEX. R. APP. PR. 44.2(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

TEX. CODE CRIM. PROC. ANN. art. 36.14. . . . . . . . . . . . . . . . . . . . 27

TEX. PEN. CODE § 19.02(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

TEX. PEN. CODE § 19.02(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

TEX. PEN. CODE § 19.02(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Tex. Pen. Code § 19.03(a)(2). . . . . . . . . . . . . . . . . . . . . . . 1, 4, 23

TEX. R. EVID. 403. . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 37, 42

## STATEMENT OF THE CASE

This case presents an appeal of a criminal judgment of conviction and sentence arising from Criminal District Court No. 1 in Tarrant County, Texas.

Appellant Jacob Jordann Bright was indicted with one count of capital murder, in violation of Texas Penal Code § 19.03(a)(2). (CR 9.) The State waived the death penalty. (CR 173.)

The case proceeded to jury trial and the jury returned a verdict of guilty. (CR 296); (6 RR 133-36.) The Court sentenced Appellant to life without parole. (6 RR 135-36); (CR 301-06.) Appellant timely filed a notice of appeal the same day. (CR 307.)

This appeal follows.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is requested.

## ISSUES PRESENTED

I.     Is the evidence legally sufficient to support a conviction?

II.    Did the trial court commit reversible jury charge error when defining capital murder and murder in the jury instructions?

III.   Did the trial court abuse its discretion when it failed to exclude text messages from "Shawn" under Rule 403 of the Texas Rules of Evidence?

## STATEMENT OF THE FACTS

### INDICTMENT

The State of Texas indicted Appellant for capital murder, as proscribed under Texas Penal Code § 19.03(a)(2). (CR 9.) That is, the State alleged that Appellant committed intentional murder in the course of a robbery or attempted robbery. (CR 9.) The indictment specifically alleged that Appellant, on or about November 19, 2012, did:

> then and there cause the death of an individual, Islander Tavira, by shooting him with a firearm, and said defendant was then and there in the course of committing or attempting to commit the offense of robbery. (CR 9.)

### ATTEMPTED ROBBERY AND SHOOTING

On November 19, 2012, Islander Tavira was shot and killed in the courtyard area of the South Gate apartment complex in Fort Worth, TX. Tavira, his girlfriend, Maria Rodriguez, and two of her children had returned to the South Gate apartments sometime during the evening. It was dark. (3 RR 67.) As they were parking, Rodriguez saw two individuals inside a breezeway which connected the parking lot to the interior courtyard of the complex. (3 RR 70-71.) Their front door was

located inside the courtyard; the breezeway provided passage between the parking lot and the front door. (3 RR 70; 80.)

Tavira pulled into a parking spot a few spaces to the left of the breezeway. *See* (State Ex. 5-7); (3 RR 71-72.) Exiting the car, Tavira walked in front of the vehicles towards the breezeway, between the vehicles and a wall of the apartment complex; Rodriguez and her children walked behind the vehicles towards the breezeway. (State Ex. 5-7); (3 RR 72-73.)

As Tavira approached the corner of the wall and the breezeway, he was near the back of a red truck. (State Ex. 11); (3 RR 75.) Near the edge of the breezeway, Rodriguez saw a short black man, dressed in all black and wearing a cold-weather mask. (3 RR 74-76.) She did not recognize him. (3 RR 77.) He held a gun in his right hand, and it was pointed at Tavira. (3 RR 78.) The man told Tavira in broken Spanish that he wanted money. (3 RR 77-78.) Tavira replied in Spanish that he didn't have any money. (3 RR 78.) The man again advised he wanted money and Tavira again told him he did not have any money. (3 RR 78.) The man had been holding his pants with his left hand. During the encounter, Rodriguez

remembered that the man let go of his pants and might have touched the red truck immediately nearby. (3 RR 90-91.)

At this point one of the minors, J.R., ran through the breezeway towards the courtyard. (3 RR 79.) The masked man then turned and ran, either after or at least in the same direction as J.R. (3 RR 79-88.) Rodriguez told Tavira that J.R. had run, and that the masked man was running after him. (3 RR 81.) Both Tavira and Rodriguez then ran through the breezeway after the masked man. (3 RR 81.)

The man ran into the grass courtyard. (3 RR 83.) He turned around and was either running or walking quickly backwards; while doing so he shot his gun. (3 RR 84-85.) Tavira was hit three times and grazed once. (5 RR 79-84.) Tavira was hit near the collarbone, below the left armpit, and in the left elbow. (5 RR 79-84.) The shot near the collarbone proved to be lethal because the bullet ruptured an artery. (5 RR 80-82.) The shot to the armpit traveled through the abdominal area. (5 RR 82-82.) A fourth shot grazed his right shoulder. (5 RR 79-80.) The man continued running in the opposite direction and left. (3 RR 86.)

According to Rodriguez, Islander stood for two minutes before he collapsed. (3 RR 87.) He was pronounced dead at the hospital. (5 RR 98.)

Mechelle Patterson testified that she saw the shooting from inside her apartment. She claimed that Appellant and Floyd McCoy were in her apartment prior to the shooting. (4 RR 83.) According to Patterson, Appellant told McCoy that he had lost some money and wanted to get it back. (4 RR 84-85.) McCoy suggested that Appellant rob someone and Appellant was receptive to that idea. (4 RR 85.) Appellant had a revolver. (4 RR 86.) The two eventually left the apartment. (4 RR 87.)

Patterson claimed she saw Floyd and Appellant "peeking around the corner of the breezeway from across [her] apartment." (4 RR 88.) But she never saw Appellant wearing any kind of face covering. (4 RR 87.) Eventually McCoy returned to the apartment. (4 RR 90-91.) At some point she saw Appellant running through the breezeway. (4 RR 92-93.) She then saw a "little Mexican man" running through the breezeway and "it looked like he was chasing after Jacob." (4 RR 92-93.) Patterson testified Appellant "turned around and fired off three shots." (4 RR 92-93.)

The man collapsed after the third shot. (4 RR 108.) She fell to the ground, began to cry, and did not see where Jacob went. (4 RR 94; 108-09.)

Beatriz Alvera, Appellant's live-in girlfriend at the time, testified that Appellant told her about the shooting. (4 RR 128.) According to Alvera, Appellant told her that he had asked a guy to "give him whatever he had." (4 RR 128.) Appellant advised her that he "noticed they knew each other," and "he took off running." (4 RR 128.) The "guy came after him and they started tussling." (4 RR 128.) He was "scared and didn't know what to do," so he "pulled the trigger." (4 RR 128.)

IDENTITY

*Without text messages*

The State elicited the following evidence in effort to establish that Appellant was the shooter.

Surveillance footage from a nearby school showed someone park a car matching Olvera's at the South Gate apartment complex several hours prior to the shooting. (5 RR 109-110; State Ex. 60.) Appellant's girlfriend arrived to pick up the car after the shooting. (5 RR 110-111; State Ex. 60.) Surveillance video also showed an individual running through the school

parking lot near the time of the shooting. (5 RR 107-108; State Ex. 60.) Cell phone records suggested that Appellant had been in the general vicinity of the shooting when the shooting took place. (4 RR 220-257.)

Brian Mason testified that he saw Appellant at the South Gate apartments earlier in the day. (4 CRR 32-33.) Mason's brother lives in South Gate; Mason's son was also present. (4 RR 32-33.) According to Mason, Appellant took an interest in a black Halloween mask in Mason's son's possession. (4 RR 32-34.) Appellant expressed interest in acquiring the mask. (4 RR 34.) When Mason left the apartment, he "threw it out the window, on the street." (4 RR 34.)

Later that day, Mason saw Appellant running towards his house (technically, his mother's house) on East Seminary. (4 RR 36.) The house is a 15-20 minute run from South Gate Apartments. (4 RR 42.) Appellant looked excited and was asking for help. (4 RR 34-39; 51.) Appellant was asked to leave and he eventually left. Rashad Holloway testified that he picked up Appellant at Mason's house. (4 RR 56; 65-66.) He took Appellant home and then took Alvera to pick up her car, dropping her off at a Citgo station near the apartment. (4 RR-56-60.)

Alvera testified that Appellant arrived back at the apartment with a man purporting to be his cousin. Alvera accompanied the cousin to the apartment complex to pick up her car, though they first strolled through the complex "to see what was going on." (4 RR 127-128.) Alvera testified that she returned and told Alvera about the shooting. (4 RR 128)

The only purported eyewitness who identified Appellant as the shooter was Patterson. She claimed McCoy had also been present, but McCoy never testified. Patterson initially claimed in a 38 minute interview with law enforcement that she did not see what happened. (4 RR 79-81.) She only identified Appellant as the shooter after she caught a felony drug case a year and a half later. (4 RR 96; 99.) Patterson met with prosecutors, changed her story, and her case was ultimately dismissed. (4 RR 94-97.) Patterson claimed she had initially been untruthful when police suspected "Dante" had been the shooter. (4 RR 80-81.)

No fingerprints or DNA could link Appellant to the robbery; no fingerprints or DNA of Appellant's could be found on the red truck located immediately near the robbery. (4 RR 201-202); (5 RR 16-26.) While

Appellant's fingerprints were found on Alvera's car, the two lived together and were in a relationship.  (4 RR 114; 212.)

*Text messages*

Over defense objection, the State admitted screen shots of text messages contained on Appellant's phone. *See* ( 5 RR 126- 140; 6 RR 6-18.) This included a series of text messages exchanged between Appellant and "Shawn," who the State established was an older brother of Appellant.  (4 RR 55; 133; 5 RR 65-66.)

They included the following:

| | |
|---|---|
| Shawn: | An get a different phone get redd of your phone.  Get a prepaid phone.  To much text an talking on that phone. |
| Appellant: | Bet |
| Shawn: | You can get away with this just play your cards right.  I got to make sure nobody talkin. you no officer west bitch ass no you.  (State Ex. 78) |
| Appellant: | I know but he aint seen me in 7 months he don't even know I still be coming to the hood. 1200 Blocc hot boy. |

***

| | |
|---|---|
| Shawn: | Did eneyone see you. |
| Appellant: | No. |

Shawn: Are you sure?

Appellant: Yea.

*See* (State Ex. 76, 77, 78, 79, 82, 83, 84, 85.)

Defendant objected to the admission of "Shawn's" texts on a number of grounds, including Rule 403 of the Texas Rules of Evidence. *See* ( 5 RR 126- 140; 6 RR 6-18.)

The State also introduced a text message to a friend, "Manual," that appeared to place Appellant at the South Gate apartments approximately an hour before the shooting:

Mon, Nov. 19, 8:23 p.m.

Appellant: Say bro im in south gates im tryna fuck wit u bro holla at me.

(State ex. 94.)

DEFENSE CASE

Appellant testified in his defense. He acknowledged that he had driven to the South Gate apartment complex in his girlfriend's car that night. (4 RR 60-61.) He testified that he had come to the South Gate apartments in order to sell a firearm and marijuana to McCoy; the transaction took place in Patterson's apartment. (6 RR 62-66.) Appellant

testified that he soon thereafter went to see a friend at a nearby apartment complex for two or three hours. (6 RR 66.)

Appellant testified that he then went outside the nearby apartment complex and sat in a car with Miesha Davis, another girlfriend. (6 RR 67.) They sat together smoking marijuana for 30-45 minutes when McCoy approached the car. (6 RR 69.) McCoy confronted Appellant about the firearm Appellant had sold him. McCoy complained the firearm did not work, and he wanted a refund. (6 RR 72-73.) The two got in fight. (6 RR 72.) After the fight, Appellant ran to Mason's house. (6 RR 72.)

JURY INSTRUCTIONS

In the Court's charge, the Court defined capital murder in the following manner:

> [a] person commits the offense of capital murder if the person intentionally *commits the offense of murder* in the course of committing or attempting to commit robbery.

(CR 289) (emphasis added). In defining murder, the Court instructed the jury that:

> [a] person commits the offense of murder if he intentionally causes the death of an individual *or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.*

(CR 289) (emphasis added).

The jury was invited to consider murder as a lesser-included offense. (CR 291-292.) Neither the murder definition nor the application paragraph included felony-murder conduct in its definition. The application paragraph provided:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 19th day of November, 2012, in Tarrant County, Texas, Jacob Jordann Bright, did then and there intentionally cause the death of an individual, Islander Tavira, by shooting him with a firearm, or intended to cause serious bodily injury to Islander Tavira and committed an act clearly dangerous to human life, by shooting him with a firearm, you will find the defendant guilty of the offense of murder.

(CR 292.)

Regarding the beyond-a-reasonable-doubt standard, the trial court instructed the jury that "[i]t is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecutions' proof exclude all reasonable doubt concerning the defendant's guilt." (CR 291.)

CLOSING ARGUMENT, JURY DELIBERATIONS, AND VERDICT

During closing argument, the State specifically emphasized Appellant's text conversation with Shawn. *See* (6 RR 130-131.) And

during deliberations, the jury requested to see the exhibits which photographed these series of text messages on Appellant's phone. *See* (CR 297.)

The jury ultimately found Appellant guilty of capital murder. (CR 296); (6 RR 133-36.) The trial court sentenced Appellant to life without parole. (6 RR 135-36); (CR 301-06.)

## SUMMARY OF THE ARGUMENT

Issue I:

The evidence was legally insufficient for two reasons. First, the evidence does not establish that the murder was committed "in the course" of a robbery or attempted robbery. The evidence shows that any attempted robbery had been abandoned by the time of the shooting. The State could only plausibly argue that the shooting was committed in immediate flight from the attempted robbery. However, this putative basis also fails, because the evidence shows that the shooter did not fire his weapon while fleeing from any attempted robbery. Rather, the evidence shows that the shooter fired his gun to stave off an attack from Tavira, who had (justifiably) gone after the shooter to protect a minor that the shooter had been or appeared to be chasing.

Second, the evidence fails to show that the shooter specifically intended to kill Tavira. The evidence shows a quick sequence of events where the shooter appeared to have gotten scared and fired his gun to avoid an attack from Tavira. The shooter did not hit Tavira in the head, heart or any other organ that might demonstrate a specific intent to kill.

Rather Tavira died because a bullet to his clavicle ruptured an artery. Additionally, the evidence shows that the shooter fled while Tavira was still standing. A rational juror would find that a shooter would not have simply left while Tavira was still standing if he specifically intended to kill him.

Issue II:

The trial court provided erroneous instructions to the jury that caused egregious harm. The trial court made two related errors in defining capital murder and murder. First, the trial court defined capital murder in terms of "intentionally commit[ting] the offense of murder" instead of narrowing the conduct to "intentionally causing the death of another." Murder was in turn defined in the charge as encompassing both 1) intentionally causing the death of another, and 2) with intent to cause serious bodily injury, committing an act clearly dangerous to human life that caused the death of another. Reading these definitions together, the jury would have been mislead into believing that serious-bodily-injury murder could support a capital murder conviction.

The trial court also erred in defining murder. It failed to include felony murder in its definition of murder. That is, the definition failed to include a third type of murder: during the course of a felony or attempted felony commits an act clearly dangerous to human life that results in the death of an individual. The application paragraph to the lesser-included offense of murder also failed to include felony murder as an option, thereby limiting the potential bases for a jury to find the lesser-included offenses of murder.

These errors caused egregious harm. The application paragraph to capital murder correctly narrowed the murder element to intentionally causing the death of Tavira, but this does not end the inquiry. Additionally, the application paragraph for felony murder failed to include felony murder in its definition. The error was particularly harmful in light of the state of the evidence. Once the jury identified Appellant as the shooter, his specific intent would have been the central issue of the trial. The chaotic events leading up to the shooting, the fact that Appellant did not shoot Tavira in the head or vital organ, and the fact that Appellant left while Tavira was standing would cast grave doubt as to whether Appellant

had a specific intent to kill. Furthermore, the arguments of counsel, or lack thereof failed to cure the harm. While the arguments of counsel did not make the error worse, their silence on this issue failed to cure the harm arising from the erroneous definitions.

Appellant also claims that the trial court erred when it instructed the jury that the prosecution need not prove guilt beyond all doubt. However, he acknowledges this particular issue is foreclosed under the Second Court of Appeals decision in *Vosberg v. State*, 80 S.W. 3d 320, 324 (Tex. App.—Fort Worth, 2002, *pet. ref'd.).* He nevertheless raises the issue to preserve for further review.

Issue III.

The trial court erred when it declined to exclude from evidence text messages found on Appellant's phone from "Shawn," a man who appeared to be Appellant's older brother. In Shawn's messages, he 1) instructs Appellant to get a different phone; 2) tells Appellant he can "get away with this" 3) informs Appellant he intends to make sure that "nobody talkin;" and 4) he inquires as to whether anyone saw him. The evidence should have been excluded under Rule 403 of the Texas Rules of Evidence.

The evidence is of limited probative value because the messages fail to specify what exactly the two are talking about. Second, to the extent that the two are talking about the shooting, the evidence fails to show what if any personal knowledge Shawn actually may have about the shooting. Third, it cannot be determined whether Shawn actually sent the incriminating text messages, as it is unknown who may have access to his phone.

For similar reasons, the evidence is unduly prejudicial. The evidence invites the jury to believe that on an irrational basis that Appellant committed the shooting. It is unknown exactly what event Shawn may be describing, and assuming it is the murder, the basis for Shawn's information is unknown. Additionally, the text messages allow the jury to rely on unknown implied hearsay, the reliability of wich cannot be tested by cross examination.

The error caused harm. The central issue of the trial was identity, and only one eyewitness, Mechelle Patterson, could positively identify Appellant as the shooter. But this witness was not credible: she initially denied any knowledge of the shooting and only changed her story after

catching a felony case.  Furthermore, her story differs in key aspects with the account of the victim's spouse, a more credible witness.  Additionally, no physical evidence could tie Appellant to the particular scene of the shooting.

The text messages provided an important (though irrational) link between Appellant and the shooting.  The State attorney specifically emphasized the text messages in his closing remarks to the jury.  Additionally, the jury specifically requested the text messages in a note to the trial court.  For these reasons, the Court has no fair assurance that the error did not influence the jury.   Thus, the conviction must be reversed.

ARGUMENT AND AUTHORITIES

I.  The evidence was legally insufficient to support a finding of guilt on capital murder.

A.  Standard of Review

While Appellant did move for a directed verdict following the State's case, (6 RR 25), challenges to the sufficiency of the evidence "need not be preserved for appellate review at the trial level, and it is not forfeited by the failure to do so." *Moff v. State*, 131 S.W.3d 485, 488-89 (Tex. Crim. App. 2004). When such a claim is raised on direct appeal, "the appellate court always has a duty to address that issue, regardless of whether it was raised in the trial court." *Id.* at 488.

In reviewing the legal sufficiency of the evidence, this Court must apply the familiar Constitutional standard: viewing the evidence in the light most favorable to the verdict, it must determine if any rational trier of fact could have found each of the essential elements of the offense to have been proven beyond a reasonable doubt. *See, e.g.*, *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Crabtree v. State*, 389 S.W. 3d 820 (Tex. Crim. App. 2012). This "*rigorous* due-process standard . . . . protect[s] a defendant from conviction without sufficient proof of every

element of the offense to satisfy the beyond-a-reasonable-doubt standard." *Gear v. State*, 340 S.W.3d 743, 749 (Tex. Crim. App. 2011) (Cochran, J., dissenting) (emphasis in original).

Under this "rigorous" standard, this Court must review *all* of the evidence and "*reasonable* inferences therefrom" and determine if the standard is met. *See, e.g., Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App.2007) (emphasis added).

B.    Argument

The evidence was legally insufficient in two respects.   First, the evidence was legally insufficient in showing that Appellant caused death "in the course of committing or attempting to commit the offense of robbery."   (CR 9.)   Secondly, the evidence was legally insufficient in showing that Appellant specifically intended to cause the death of the Tavira.

In order to establish that the death was caused "in the course of committing" robbery or attempted robbery under § 19.03(a)(2), the State must prove the murder took place "in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of the

offense . . . of robbery." *Riles v. State*, 595 S.W. 2d 858, 862 (Tex. Crim. App. 1980); *see McGee v. State*, 774 S.W. 2d 229, 234 (Tex. Crim. App. 1989). The evidence showed no such nexus between any robbery or attempted robbery.

The evidence demonstrated that the shooting had taken place after an attempted robbery. Rodriguez testified that a masked individual held Tavira at gunpoint and twice asked for money in Spanish. (3 RR 77-78.) But once her minor child ran past them through the breezeway, the masked individual took off behind the child and appeared to be chasing the child. (3 RR 79-88.) Rodriguez and Tavira then ran after the masked individual. (3 RR 81.) The masked individual eventually turned around and opened fire. (3 RR 84-85.) Patterson similarly testified that it looked like the "little Mexican man . . . was chasing after Jacob." (4 RR 92-93.) It was at that point that Jacob "turned around and fired off three shots." (4 RR 92-93.)

The evidence shows that the shooter had abandoned the commission of any robbery and thus the shooting did not take place "in the course" of any robbery or attempted robbery. The evidence shows that the shooter

fired the gun at Tavira in order to stave off any attack from him; he and Rodriguez were running after him, apparently out of justifiable concern for their child. No evidence in the record suggests that the shooter still has any interest in effectuating a robbery.

The only remotely plausible basis for finding the shooting took place "in the course" of an attempted robbery would be that the shooting took place "in immediate flight after the [robbery] attempt." *Riles*, 595 S.W. 2d 858, 862 (Tex. Crim. 1980). But the evidence fails to support this theory as well. The evidence did not suggest that Tavira was chasing Appellant after a failed attempt to rob him. On the contrary, it was clear that Tavira was chasing after the masked individual because of a perceived threat to J.R. The masked individual then shot Tavira because it appeared that Tavira would (justifiably) attack him. The shooter did not appear to fire at Tavira in order to effectuate his escape from the attempted robbery itself.

Secondly, no rational juror could have found beyond a reasonable doubt that Appellant specifically intended to kill Tavira. *See Fuentes v. State*, 991 S.W. 2d 267, 272 (Tex. Crm. App. 1999) ("The distinguishing

element between felony murder and capital murder is the intent to kill.")

At best the evidence showed that Appellant "committed an act clearly dangerous to human life" in firing shots at Appellant, whose death was caused by a shot to the collarbone which happened to rupture an artery. (5 RR 81.)

Tavira sustained no injuries to the head or vital organs such as the heart. The decedent was hit in the elbow, the left armpit, left collarbone, and grazed on the right shoulder. It just so happened that the shot to the collarbone ruptured an artery. The evidence shows this to have been a quick decision made soon after turning around and while in retreat from a charging Tavira. The evidence shows a quick, clearly dangerous act committed to stave off an attack, not an act specifically calculated to end Tavira's life.

The evidence below stands in stark contrast to a scenario where a robber shoots a convenience store clerk in the head at close range while the clerk is kneeling at gunpoint. Those facts evince an *intent to kill*; or at the very least a rational juror could find such intent beyond a reasonable doubt given the circumstances. But here there no such facts.

Rodriguez testified that Tavira remained standing for several minutes prior to falling to the ground. (3 RR 87.) Had the shooter specifically intended to kill Tavira, it would stand to reason that he would have fired another shot at close range.

A rational trier of fact must not only find that the evidence gives rise to an plausible inference of such intent; the rational juror must find the evidence yields such an inference *beyond a reasonable doubt*. No rational juror could conclude on these facts beyond a reasonable doubt that Appellant specifically intended to kill Tavira. For these reasons, the conviction must be reversed.

II.    The trial court provided erroneous instructions to the jury which constitute reversible error.

A .   Standard of Review

Under Rule 36.14 of the Texas Code of Criminal Procedure, the "trial judge is ultimately responsible for the accuracy of the jury charge and accompanying instructions." *Taylor v. State*, 332 S.W. 3d 483, 488 (Tex. Crim. App. 2011). This duty exists "even when defense counsel fails to object to inclusion or exclusions in the charge." *Id.* at 486. Claims of jury

charge error are thus reviewable notwithstanding the absence of a timely objection at trial.

If no objection is made, this Court will reverse the jury charge error if the error resulted in "egregious harm." *Id.* at 489 (citing *Almanza v. State*, 686 S.W. 2d 157, 171 (Tex. Crim. App. 1985)). Egregious harm means the error was such that it "deprived [Appellant] of a fair and impartial trial." *Taylor*, 332 S.W. 3d 489; *see Almanza,* 686 S.W. 2d at 489. "The record must disclose 'actual rather than theoretical harm,' and the error must have affected the very basis of the case, deprived the defendant of a valuable right, or vitally affected a defensive theory." *Nava v. State*, 415 S.W. 3d 289, 298 (Tex. Crim. App. 2013) (citing *Taylor,* 332 S.W. at 489). In conducting its inquiry, the Court must look to the jury charge, the state of the evidence, the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole. *Id.*

B.   Argument

1)   The court erroneously instructed the jury as to the definitions of capital murder and murder.

The trial court made multiple errors in the jury charge. First, it defined capital murder in a way that would lead a jury to believe it did not

necessarily have to find that Appellant specifically intended to kill Tavira.

Second, the trial court failed to include felony murder in both its definition of murder, and in the application paragraph of the lesser-included offense, thereby limiting the range of options for the jury regarding the lesser included offense.

First, the trial court provided an erroneous definition of capital murder to the jury. It defined capital murder as the intentional commission of *murder* instead narrowing the definition to the type of murder that could give rise to a capital offense. The trial court's instruction provided:

> [a] person commits the offense of capital murder if the person intentionally *commits the offense of murder* in the course of committing or attempting to commit robbery.

(CR 289) (emphasis added). The trial court in turn defined murder as:

> [a] person commits the offense of murder if he intentionally causes the death of an individual *or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual*.

(CR 289) (emphasis added).

This was error. Capital murder requires the specific intent to kill. *See Threadgill v. State*, 146 S.W. 3d 654, 655 (Tex. Crim. App. 2004) ("The

element distinguishing capital murder from felony murder is the intent to kill."). The trial court defined capital murder too broadly. Instead of limiting its definition to intentionally causing the death of an individual, it defined capital murder generally as the intentional commission of murder. The problem here is that some types of murder fail to establish a capital offense; capital murder requires a specific intent to kill. *Threadgill*, 146 S.W. 3d at 655. The trial defined murder as (1) intentionally causing the death of another (authorized basis for capital murder), *and* (2) with intent to cause serious bodily injury, the commission of an act clearly dangerous to human life (unauthorized basis for capital murder). By defining capital murder as the intentional commission of murder, the jury was authorized to find Appellant guilty of capital murder even if it failed to find that he specifically intended to cause the death of Tavira. Said another way, the instructions suggested that serious-bodily-injury murder could support a capital murder conviction. It cannot.

Secondly, the trial court failed to include felony murder within the applicable definition of murder. In defining murder, the trial court provided the jury with the definitions of murder provided in Sections

19.02(b)(1) & (2) of the Texas Penal Code. *See* (CR 289.) That is, the causing defined murder as either: intentionally causing the death of another [(b)(1) definition], or where an individual intends to cause serious bodily injury, he commits an act clearly dangerous to human life that causes the death of another [(b)(2) definition]. *See* (CR 289.) But the trial court failed to provide for the third possibility, felony murder under § 19.02(b)(3):

> commits or attempts to commit [robbery]. . .and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

TEX. PEN. CODE § 19.02(b)(3).

By failing to define murder with respect to this third definition, the jury was given only a limited basis to find Appellant guilty of the lesser-included offense of murder. This error was not cured by the application paragraph. The application paragraph was also missing language pertaining to felony murder:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 19th day of November, 2012, in Tarrant County, Texas, Jacob Jordann Bright, did then and there intentionally cause the death of an individual, Islander Tavira,

by shooting him with a firearm, or intended to cause serious bodily injury to Islander Tavira and committed an act clearly dangerous to human life, by shooting him with a firearm, you will find the defendant guilty of the offense of murder. (CR 292.)

Failure to include felony-murder in the definition and application paragraphs limited the jury's ability to consider the full range of possibilities for the lesser-included offense of murder.

2)      The errors caused egregious harm.

The first factor the Court must consider is the jury charge.  *See Nava*, 415 S.W. 3d at 298.  This factor arguably cuts in favor of both sides. The application paragraph for capital murder did correctly limit the murder definition to  "intentionally causing the death of . . . Tavira." (CR 291.)  But the application paragraph for the lesser offense of murder still failed to include the felony-murder definition.[1]   *See* (CR 292.)

---

[1] To the extent the Court finds Appellant fails to prevail on the first factor, he submits he should still prevail after consideration of all the factors.  In an unpublished case, the Court of Criminal Appeals reversed an appellate court that did not conduct analysis using all of the *Almanza* factors after concluding that the application paragraph had been correct. *See Dougherty v State*, 188 S.W. 3d 670, 2006 WL 475802 at *1 (Tex. Crim. App. 2006).  The appellate court in *Dougherty* had relied on *Medina v. State*, 7 S.W. 3d 633, 640 (Tex. Crim. App. 1999) for the proposition that errors in the abstract instructions can never be "egregious" where the application paragraph is correctly written.  *See Dougherty v. State*, 2007 Tex App. LEXIS 4449 (Tex. App. Houston 1st Dist., June 7, 2007) (unpublished).  In reversing, the Court of Criminal Appeals indicated that no such bright line rule exists.  Even where the application

The second factor the Court must consider is the state of the evidence. *Nava v. State*, 415 S.W. 3d at 298   The state of the evidence militates in favor of reversal.  It is true that identity was the primary focus of the parties at trial.  But once the jury identified Appellant as the shooter, Appellant's specific intent during the shooting would have been the central issue for the jury to decide.  There was limited evidence regarding the circumstances of the shooting itself----essentially two eyewitnesses (to the extent that both should be believed).  And these witnesses describe a sudden, chaotic event in which Appellant was suddenly being chased by Tavira, with Rodriguez not far behind.  He turned around and fired three or four shots.  The physical evidence shows that Tavira sustained no gunshot wounds to the head, nor to any vital organs that might have been attractive targets for a gunman specifically intending to kill.  Instead, Tavira died from a bullet near the collar bone that unfortunately ruptured an artery. (5 RR 82.) Additionally, Rodriguez testified that Tavira remained standing for two minutes after the

_____

paragraph is correct, an appellate court must consider all of the *Almanza* factors when assessing harm.  *See Chaney v. State*, 314 S.W. 3d 561, 568-573 (Tex. App.—Amarillo 2010) (citing *Doughtery and* finding egregious harm even where application paragraph had been correct).

shooting. (3 RR 87.) A juror would have a difficult time finding a specific intent to kill where the shooter left the victim while he was standing. Furthermore, it was dark, and thus it would have been difficult for him to ascertain whether he had done enough damage to Tavira to kill him.

Third, the court must consider the arguments of counsel. *Nava*, 415 S.W. 3d at 298. Appellant acknowledges that neither government nor defense counsel discussed this error. But Appellant submits that this very silence provides a reason why this factor should cut in his favor. Neither side drew the jury's attention to the faulty jury instructions. Thus, while neither side exacerbated the error with their comments, neither side mitigated the error either by steering the jury in the right direction. And this was not an issue which the jury may have avoided confronting. Once identity was established, the jury was *inevitably* going to have to decide upon Appellant's specific intent at the time of the shooting.

3)      Foreclosed issue: the trial court erred when it instructed the jury that the State need not "prove guilt beyond all possible doubt."[2]

The trial court erred reversibly erred in providing a partial definition of beyond a reasonable doubt. Specifically, the trial court instructed the jury "[i]t is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecutions' proof exclude all reasonable doubt concerning the defendant's guilt." (CR 291.)

Appellant submits this was error. In *Paulson v. State*, 28 S.W. 3d 570, 572 (Tex. Crim. App. 2000), the Court of Criminal Appeals held that "the better practice is to give no definition of reasonable doubt at all." By instructing a jury that beyond a reasonable doubt does not mean all possible doubt, the trial court is providing at least a partial definition of beyond a reasonable doubt. Appellant acknowledges that this issue is foreclosed by the Second Court of Appeals' decision in *Vosberg v. State*, 80 S.W. 3d 320, 324 (Tex. App.—Fort Worth, 2002, *pet. ref'd*), and in the Second Court of Appeals more recent decision in *Matthews v. State*, 2015 Tex. App. LEXIS 6861 (Tex. App.—Fort Worth, July 2, 2015) (declining to

---

[2] Foreclosed by *Vosberg v. State*, 80 S.W. 3d 320, 324 (Tex. App.—Fort Worth, 2002, *pet. ref'd.)*

overrule *Vosberg*). Nevertheless, he preserves the issue for further review. Counsel will note that the Second Court of Appeals in *Matthews* observed that "we do not now hold that giving such an instruction is a wise thing for trial courts to do," and hardly appeared enthusiastic about its *Vosberg* decision. *Id.* at *2.

III. The trial court erred by declining to exclude from evidence text messages from "Shawn," in violation of TEX. R. EVID. 403.

A. Standard of review

A trial court's decision as to whether admit or exclude evidence is reviewed under an abuse of discretion standard. *Torres v. State*, 81 S.W. 3d 758, 760 (Tex. Crim. App. 2002); *see Montgomery v. State*, 198 S.W. 3d 67, 79 (Tex. App.—Fort Worth, 2006, *pet. ref'd.*) The trial court's decision will be reversed if it was "outside the zone of reasonable disagreement" among jurists. *Montgomery*, 198 S.W. 3d at 77.

In conducting its prejudice v. probative analysis when reviewing Rule 403 violations, the Court considers (1) how probative is the evidence; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence. *Montgomery*, 198

S.W. 3d at 77 (citing *Soloman v State*, 49 S.W. 3d 345, 366 (Tex. Crim. App. 2001)).

Non-constitutional errors are reversible if the error affected Appellant's substantial rights. *See* TEX. R. APP. PR. 44.2(B). An error affects a substantial right when it has a substantial and injurious effect or influence on the verdict. *King v. State*, 953 S.W. 2d 2266, 271 (Tex. Crim. App. 1997). An error does not affect a substantial right if the Court has "fair assurance that the error did not influence the jury, or had but slight effect." *Solomon v. State*, 49 S.W. 3d 356, 365 (Tex. Crim. App. 2001). The Court considers "everything in the record[,] . . . includ[ing] testimony, physical evidence, jury instructions, the State's theories and any defense theories, and voir dire, if applicable." *Schmutz v. State*, 440 S.W. 3d 29, 39 (Tex. Crim. App. 2014).

## B. Argument

Rule 403 of the Texas Rules of Evidence provides that a court "may exclude evidence if its probative value is substantially outweighed by a danger of," among other things, "unfair prejudice," "confusing the issues," and misleading the jury. TEX. R. EVID. 403. The trial court erred under

Rule 403 when it admitted into evidence the following texts from Shawn, during his conversation between Shawn and Appellant:

| | | |
|---|---|---|
| Shawn: | An get a different phone get redd of your phone. Get a prepaid phone. To much text an talking on that phone. | |
| Appellant: | Bet | |
| Shawn: | You can get away with this just play your cards right. I got to make sure nobody talkin. you no officer west bitch ass no you. | |
| Appellant: | I know but he aint seen me in 7 months he don't even know I still be coming to the hood. 1200 Blocc hot boy. | |

***

| | |
|---|---|
| Shawn: | Did eneyone see you. |
| Appellant: | No. |
| Shawn: | Are you sure? |
| Appellant: | Yea. |

*See* (State Ex. 76, 77, 78, 79, 82, 83, 84, 85); (6 RR 18.)

Shawn's texts within the context of this conversation are plainly offered to show that Appellant was the shooter. But his actual comments have very limited probative value. First, there is no indication that

Shawn has any personal knowledge of the events giving rise to the shooting. Any putative knowledge he may have had in connection with the shooting may be based on hearsay, rumors, or speculation.

Second, the statements fail to show exactly what Shawn is talking about. Shawn admonishes (1) Appellant to switch phones, (2) reassures him that he can get away with "this;" (3) advises that he needs to ensure no one is discussing the matter; and (4) inquires whether anyone saw him. But nowhere does Shawn reveal what particular act Appellant committed that needs to be kept secret.

Third, we have no assurance that it is in fact Shawn sending the texts and not someone else. The statements could have come from with anyone who may have had access to Shawn's phone or his number.

By contrast, the evidence was extraordinarily prejudicial. The jury was able to rely on hearsay by implied assertions. The evidence invites the jury to irrationally find that Shawn either had personal knowledge of the murder, or that Appellant had previously confessed to the murder. But Shawn's statements could have been based on circulating rumors, or Shawn could have been talking about a different event altogether. The

defense could not cross-examine Shawn regarding the subject matter of his statements, nor what, if any, personal knowledge Shawn might have had regarding the shooting.

The central issue of the trial was identity. The court can have no assurance that the admission of such evidence "did not influence the jury." *Solomon,* 49 S.W. 3d at 356. In fact, record evidence shows that the jury found the text messages important. In its first Jury Note, the jury specifically requested photos of the text messages between defendant and Shawn. *See* (CR 297.)

Furthermore, the prosecutor emphasized the text messages in its closing argument in efforts to establish that Appellant was the shooter:

And that's not all you have. These text messages . . .

* * *

That is a problem. You better get up there and lie about it. You better come up with something. Get a different phone–from Shawn. Get rid of your phone. Get a prepaid phone. Too much text and talking on that phone. You know what they're talking about. And the Defendant says: You bet. Got it. I'll do that.

Shawn:    This is not good—for the Defendant. You can get away with this. Just play your cards right. I got to make sure nobody talking. You know Officer West bitch ass, know you. I know, but he aint' seen me in seven months. He don't even

know I still be coming to the hood. You can get away with it. I didn't have to ask the Defendant one question about these text messages. They speak for themselves. In a moment of weakness and candor, the Defendant and his brother sent these back and forth to each other. I didn't have to ask him one question. You knew what these text messages meant.

*See* (6 RR 130-131.)

The State had only one eyewitness who could specifically identify Appellant as the shooter. While there were two putative witnesses to the shooting, only Patterson could identify Appellant. Rodriguez did not recognize the shooter. Nor did the State have any physical evidence linking Appellant to the shooting. Aside from Patterson, the government had at best a circumstantial case in establishing that Appellant was the shooter. Furthermore, the State's only eyewitness was not credible. Upon initially being questioned, Patterson denied having any knowledge of the shooting. (4 RR 79-81.) She specifically admitted that she lied when "Dante" had initially been the suspect. (4 RR 80-81.) It was only after catching a felony case that Patterson decided to change her story and point the finger at Appellant. (4 RR 96-99.)

Patterson's story also differs from Rodriguez's in several critical aspects, and Rodriguez would not have any reason to be untruthful. First,

Patterson testified that she did not see Appellant wearing any kind of mask. (4 RR 87.) Second, Patterson testified that Tavira "went to the ground" after the shooting. (4 RR 108.)

The text messages provided a crucial, though prejudicial link for the jury. The brother's comments would lead the jury to find "in some irrational, but nevertheless indelible way" that Appellant had in fact been the shooter. The jury might find this notwithstanding the fact that the (1) the text messages themselves fail to actually to specify the particular offense being discussed; (2) the messages fail to establish the basis for Shawn's personal knowledge; and (3) the messages fail to establish that it had in fact been Shawn who sent the text messages.

For these reasons, the Court should find that the trial court reversibly erred in failing to exclude Shawn's text messages under FED. R. EVID. 403.

PRAYER

WHEREFORE, PREMISES CONSIDERED, Appellant respectfully prays that this Court will reverse the conviction and sentence. Alternatively, he respectfully requests the Court grant him such other and further relief as he may show himself deserving, at law and in equity.

Respectfully submitted,

/s/ William R. Biggs
William R. Biggs
WILLIAM R. BIGGS, PLLC
115 W. 2nd St., Suite 202
Fort Worth, TX 76102
817.332.3822 (t)
817.332.2763 (f)
wbiggs@williambiggslaw.com
TX Bar No. 24052832

## CERTIFICATE OF COMPLIANCE

I certify that this Brief was prepared with WordPerfect X7, and that according to that program's word-count function, the entire document contains words 8,496 words. Thus, the brief complies with Rule 9.4(i)(2)(B) of the Texas Rules of Appellate Procedure.

/s/ William R. Biggs
WILLIAM R. BIGGS

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2015, I filed a copy of the foregoing electronically. The State will receive electronic notice of this filing at coaappellatealerts@tarrantcounty.com. On September 29, 2015, this brief will be sent via USPS mail to Debra Windsor, Tarrant County District Attorney's Office, 401 W. Belknap, 4th Floor, Fort Worth TX 76196. Finally, a copy of this motion and the accompanying brief will be sent by certified mail to Jacob Jordann Bright, TDCJ No. 01985440, Telford Unit,3899 Hwy 98, New Boston, TX 75570.

/s/ William R. Biggs
WILLIAM R. BIGGS